## FLANNAGAN et al. v. CALIFORNIA NAT. BANK et al.

### (Circuit Court, S. D. California. June 19, 1893.)

### No. 534.

NATIONAL BANKS—CASHIER—PROMISE TO PAY DRAFT.

Rev. St. § 5136, empowers a national bank to "exercise, by its board of directors or duly-authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking, by discounting and negotiating promissory notes, drafts, * * * and other evidences of debt; * * * by loaning money on personal security," etc. *Held*, that the cashier of a national bank has no power to bind it to pay the draft of a third person on one of its customers, to be drawn at a future day, when it expects to have a deposit from him sufficient to cover it, and no action lies against the bank for its refusal to pay such a draft.

At Law. Action by P. Flannagan and J. W. Bennett, partners in business under the firm name of Flannagan & Bennett, against the California National Bank and others. Judgment for defendants.

Burnett & Gibbon, for plaintiffs.

M. T. Allen, for defendants.

ROSS, District Judge. The plaintiffs, who are citizens of Oregon, and bankers doing business at the city of Marshfield, in that state, bring this suit to recover the amount of a certain draft drawn by one Baines on the defendant Graham. By their complaint the plaintiffs seek to charge the defendant the California National Bank of San Diego, now in the hands of the defendant receiver, with the payment of the draft; and a demurrer filed by the receiver, on behalf of the bank, raises the question of the latter's liability.

The complaint alleges that on the 15th of September, 1891, Graham, through his agent, Baines, applied to the plaintiffs, at their bank in Marshfield, for a loan of $6,000, "to be paid by draft upon said California National Bank of San Diego." This allegation in respect to the proposed drawee was probably a mistake of the pleader, for that allegation is immediately followed by this:

"At the same time, plaintiffs received a telegram, sent by said California National Bank to plaintiffs, in which it stated that Baines' draft on Graham for $6,000 was [would be] good on the 16th of the next month."

To which telegram plaintiffs replied by a telegram as follows:

"Marshfield, Coos Co., Or., Sept. 16, 1891.
"To California National Bank, San Diego, California: Will you pay Baines' draft on Graham for $6,000.00 on October 15, next?
"Flannagan & Bennett."

In reply to this telegram, plaintiffs received, on September 18, 1891, the following, by telegraph, from the defendant bank:

"San Diego, Cal., Sept. 18, 1891.
"To Flannagan & Bennett, Marshfield, Or.: See our telegram of 15th. Should Graham money arrive earlier, we will pay when it comes, possibly tenth.                                California National Bank."

To which plaintiffs, on the 19th of September, replied by telegraph as follows:

"Marshfield, Coos Co., Or., Sept. 19, 1891.
"To California National Bank, San Diego, Cal.: Are we to understand that you will pay Baines' draft on Graham for $6,000.00 not later than 16th of next month?                          Flannagan & Bennett."

Receiving in reply the following:

"San Diego, Cal., Sept. 21, 1891.
"To Flannagan & Bennett: Yes.          G. N. O'Brien, Cashier."

O'Brien was at the time the cashier of the California National Bank. Upon the receipt of the last-mentioned telegram the plaintiffs paid to Baines, for the use of Graham, $6,000, and received from Baines a draft, signed by him, in words and figures as follows:

"$6,000.00.                              Marshfield, Sept. 23rd, 1891.
"On October 16th, 1891, pay to the order of Flannagan & Bennett six thousand dollars, value received, and charge the same to account of
"W. E. Baines.
"To R. A. Graham, California National Bank, San Diego."

On the 16th of October, 1891, the draft was duly presented to the defendant bank, and payment demanded, which was refused, and subsequently payment was demanded of defendant Graham, who likewise failed to pay the same.

It is apparent from the averments of the complaint that at no time did the defendant bank, or its cashier, promise to pay any draft drawn on the defendant bank. Had such promise been made, and plaintiffs had parted with their money on the strength of it, the case would be like that of Garrettson v. Bank, 47 Fed. Rep. 867, and a like ruling would be made here, for I have no doubt of the correctness of that decision. But the present case is altogether unlike that. The promise here counted on was the promise of the cashier of the defendant bank to pay Baines' draft on Graham, who, it would seem from the telegrams, was a customer of the defendant bank, and an anticipated depositor; and the question for decision is, whether such a promise of the cashier of a national bank is binding upon the bank. A national bank is empowered, by the seventh subdivision of section 5136 of the Revised Statutes, "to exercise, by its board of directors or duly-authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes according to the provisions of" the title providing for the organization of such banks. Everyone dealing with such a bank does so with notice of, and subject to, the powers conferred, and limitations imposed, by the law of its creation. The provision of the statute quoted, under which the defendant bank was organized, did not authorize its board of directors, or any of its officers or agents, to bind it to pay a draft of one of its customers or depositors. The telegraphic correspondence in the case at bar shows that the defendant bank was anticipating that it would have funds of Graham not later than the 16th of October, 1891, out of which it proposed to pay the draft to be drawn by Baines on Graham; and the definite promise made by the cashier of the bank, by his telegram of September 21, 1891, in answer to that of the plaintiffs, asking, "Are we to understand that you will pay Baines' draft on Graham, for $6,000, not later than 16th of next [October] month?" was, in effect, a promise to answer for the obligation of Graham. Such a promise was beyond the power of the cashier to make, and the defendant bank was unaffected by it. It was organized to carry on the business of banking "by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes, according to the provisions of" the statute under which it was organized. None of these things embrace, directly or incidentally, a promise to pay, without consideration moving to it,

a draft drawn by a third party on one of its customers or depositors. In Bank v. Dunn, 6 Pet. 51, the court would not permit the president and cashier of the bank to bind it by their agreement with the indorser of a promissory note that he should not be liable on his indorsement. It said it is not the duty of the cashier and president to make such contracts, nor have they power to bind the bank, except in the discharge of their ordinary duties.

In the case of U. S. v. City Bank of Columbus, 21 How. 356, the cashier of the defendant bank wrote to the secretary of the treasury, saying that the bearer of the letter, one Miner, who was one of the directors of the bank, was authorized to contract for the transfer of money from New York to New Orleans. Upon that representation the secretary turned over to Miner $100,000 of the government money for transfer from New York to New Orleans, and, Miner having failed to deliver or account for it, the government sought to recover the amount from the bank. But, it appearing that the action of the cashier was without the authority or knowledge of the president or board of directors, the supreme court held that it was outside of his duties and powers, and that the bank was not liable. In West St. Louis Sav. Bank v. Shawnee County Bank, 95 U. S. 557, where it was attempted, but unsuccessfully, to bind a bank as an accommodation indorser on the individual note of its cashier, the court said:

"Ordinarily, the cashier, being the ostensible executive officer of a bank, is presumed to have, in the absence of positive restrictions, all the powers necessary for such an officer in the transaction of the legitimate business of banking. Thus, he is generally understood to have authority to indorse the commercial paper of his bank, and bind the bank by the indorsement. So, too, in the absence of restrictions, if he has procured bona fide rediscount of the paper of the bank, his acts will be binding, because of his implied power to transact such business; but certainly he is not presumed to have power, by reason of his official position, to bind his bank as an accommodation indorser of his own promissory note. Such a transaction would not be within the scope of his general powers; and one who accepts an indorsement of that character, if a contest arises, must prove actual authority before he can recover. There are no presumptions in favor of such a delegation of power. The very form of the paper itself carried notice to a purchaser of a possible want of power to make the indorsement, and is sufficient to put him on his guard. If he fails to avail himself of the notice, and obtain the information which is thus suggested to him, it is his own fault, and, as against an innocent party, he must bear the loss."

The principle controlling the decisions cited is equally applicable to the case at bar. Demurrer sustained.