## ALDRICH v. CHEMICAL NATIONAL BANK.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE SIXTH
CIRCUIT.

No. 58.   Argued October 20, 1899. — Decided March 5, 1900.

H., as vice president of a Cincinnati bank, made application to a New
York bank for a loan of $300,000. The request was granted and that
amount was placed to the credit of the Cincinnati bank upon the books
of the New York bank. Immediately thereafter H. fraudulently caused
himself to be personally credited upon the books of his own bank with
a like sum of $300,000. The action of H. in negotiating the above loan
with the New York bank was unauthorized by the board of directors of
the Cincinnati bank, but after the arrangement had been made that bank
drew out by check the money that had been placed to its credit by the
New York bank and used the same in discharging its valid obligations.
*Held,* that by so using the money obtained from the New York bank by
H. in his capacity of vice president, the Cincinnati bank became bound
to account for the same as for money had and received, and could not
escape liability to the New York bank upon the mere ground, supposing
it to be true, that it was not permitted by its charter to borrow money.
The fraud perpetrated by H. upon his own bank in having himself per-
sonally credited upon its books with the amount of the loan, was a mat-
ter with which the New York bank had no connection, and its right to
recover could not be affected thereby. The liability of the Cincinnati
bank rested upon the fact, and the implied obligation arising therefrom,
that that bank used in its business and for its benefit the money which
the other bank placed to its credit in consequence of the loan negotiated
by H. who assumed to represent it.

There is nothing in the acts of Congress authorizing or permitting a national
bank to appropriate and use the money or property of others without
incurring liability for so doing.

This case and *Western National Bank* v. *Armstrong*, 152 U. S. 346, dis-
tinguished.

THE statement of the case will be found in the opinion of
the court.

*Mr. Francis F. Oldham* and *Mr. John W. Herron* for
appellant.

*Mr. George H. Yeaman* and *Mr. William Worthington* for
appellee. *Mr. George C. Kobbé* was on their brief.

MR. JUSTICE HARLAN delivered the opinion of the court.

This litigation has extended over many years and the case as now presented will be best understood if a statement be made showing the proceedings in the Circuit Court and Circuit Court of Appeals.

In its bill in this case the Chemical National Bank alleged that on the 2d day of March, 1887, it loaned to the Fidelity National Bank the sum of $300,000 which the latter bank promised to repay on demand with interest from the date of the loan and at the same time delivered as collateral security therefor a certificate of deposit for the above amount together with sundry promissory notes.

The certificate referred to was in the following form: "Certificate of Deposit. This certificate is not subject to check, but must be presented to draw the money. No. 345. The Fidelity National Bank. Cincinnati, Feb. 28, 1887. E. L. Harper has deposited in this bank three hundred thousand dollars ($300,000), payable to the order of himself on return of this certificate in current funds. $300,000. Ammi Baldwin, Cashier. Indorsed: 'E. L. Harper.'"

It was alleged that the signature of Baldwin as cashier was used as the signature of the bank by its authority.

The bill then stated that on May 21, 1887, the Chemical Bank at the request of the Fidelity Bank returned some of the notes delivered as collateral security and received in substitution therefor other notes. The latter notes were described in a schedule attached to the bill, and it was alleged that the bank was still the owner and holder of them, except three executed by J. W. Wilshire for $25,000 each which had been paid at maturity by John V. Lewis, the indorser thereof, the money so paid being held in lieu of the notes delivered as collateral security for the loan.

After setting forth the appointment on the 21st day of June, 1887, of Armstrong as receiver of the Fidelity Bank as well as the subsequent proceedings by which on the 12th day of July, 1887, that corporation was dissolved, the bill alleged that the Fidelity Bank never repaid the loan nor any

part thereof; that the Chemical Bank presented to the receiver proof of its claim and requested him to submit it to the Comptroller of the Currency in order that a dividend might be paid to it from the assets of the bank equal in ratio to the dividends paid to other creditors, and that it might thereafter receive further dividends until its claim was paid; but that the Comptroller and the receiver had refused to allow it to be enrolled as a creditor.

The receiver without explicitly responding to the allegations of the bill as to the making of the loan said that he was unable to state whether or not the plaintiff loaned to the Fidelity Bank the sum of $300,000. In an amended answer he specifically denied that the Chemical Bank loaned to the Fidelity Bank the sum named, or that any such loan was made by the former to the latter on the faith and credit of the alleged certificate of deposit or that such certificate was executed and delivered by the cashier of the Fidelity Bank as its act and by its authority.

The answer averred that on the second day of March, 1887, and prior thereto Harper was the vice president of the Fidelity Bank and engaged in speculations in which he used its funds; that in the use of those funds he was assisted by Baldwin, but that such use was not known to the other directors of the bank, was not authorized by it, and was a fraudulent and illegal appropriation of its funds for the personal use of Harper; that a paper was signed by Baldwin, as cashier of the Fidelity Bank, which was believed to be the same paper alleged to be a certificate of deposit of the Fidelity Bank; that such certificate was not entered upon the books of the bank nor taken from the book from which, if regular, it should have been taken; that its execution was unknown to the other officers of the bank and was unauthorized by it; and that no consideration was received for it by the Fidelity Bank from Harper or from any other person nor was money deposited in the bank as the basis of the certificate.

Continuing, the defendant averred that the certificate of deposit and the promissory notes described in the bill were forwarded to the Chemical Bank by Harper, and the sum of

$300,000 was received by him from that bank; that he represented to the officers of the Fidelity Bank that the money was received from a loan made to him and by his direction was credited on his personal account, and was thereupon drawn out and used for his individual purposes, and that the other officers of the bank had no knowledge that the facts were otherwise than as represented by him. It was also averred that a large portion of the promissory notes delivered as collateral security for the loan were the personal property of Harper in which the Fidelity Bank had no interest.

The answer, after reciting the fact of the payment by the indorser Lewis of the three notes made by Wilshire for $25,000 each, alleged that the fourth note of Wilshire for the same amount, also indorsed by Lewis, was not presented for payment by plaintiff at maturity, in consequence whereof that note was not paid and the indorser was discharged. It was also averred that the Chemical Bank credited the payment of the above three sums of $25,000 upon the alleged loan of $300,000, reporting the same to the defendant as payments on that account, and treated them in all respects as proper credits on such loan. Payment of certain other notes since the bringing of the action was also alleged to have been made to the Chemical Bank.

The defendant therefore claimed that the Fidelity Bank was not liable to the Chemical Bank for the amount of the loan, but if it were otherwise adjudged, the defendant asked that all payments made to the plaintiff upon the collateral paper forwarded by Harper as security for the loan should be credited thereon; that the above note of Wilshire, indorsed by Lewis, not having been paid in consequence of plaintiff's neglect to present the same for payment, should be also credited; that the balance of the collateral paper should first be exhausted and the proceeds credited; and that the plaintiff should be permitted to prove only the amount found due after such credits had been made.

To the answer as amended the plaintiff filed a general replication.

In deciding the case the Circuit Court among other things

said: "Conceding that the transaction of the $300,000 loan was fraudulent as between E. L. Harper and the Fidelity Bank and that he appropriated the entire proceeds to his individual use, the claim of the Chemical Bank, which dealt in good faith in the transaction and was innocent of any knowledge or participation in the fraud, is not affected thereby. The negotiation of the loan was within the authority of Harper as vice president of the Fidelity Bank, and if he used that authority fraudulently for his own advantage, the bank that enabled him to commit the fraud must suffer from the consequences, and not the bank that made the loan and advanced the money, under the representation and in the belief that it was conducting a fair, legitimate business transaction with the Fidelity Bank." But the court held that all collections made prior to the filing of the claim upon the collaterals held by the Chemical Bank as security for the loan should be deducted therefrom. 50 Fed. Rep. 798, 802.

From this decision both parties appealed to the Circuit Court of Appeals. That court reversed the decree, holding upon an extended review by Judge Taft of the adjudged cases that creditors of an insolvent national bank could not be required *in proving their claims* to allow credit for any collections made after the declared insolvency of the bank from collateral securities held by them. 16 U. S. App. 465; 59 Fed. Rep. 372.

The Chemical Bank filed a petition for rehearing upon the ground that the court had erred in fixing the amount of interest to be allowed the bank on the dividends declared.

While that petition was under consideration by the Circuit Court of Appeals, this court decided the case of *Western National Bank* v. *Armstrong*, 152 U. S. 346, which related to a transaction between that bank and Harper. Thereupon the receiver filed a petition for rehearing, upon the question as to the validity of the loan involved in the present suit.

The above petitions for rehearing having been granted, the cause was again heard in the Circuit Court of Appeals and it was there decided that under the special facts disclosed by the evidence, and in view of the decision in *Western National Bank* v. *Armstrong*, the parties should be allowed an oppor-

tunity to introduce further evidence "upon the issue whether the Fidelity Bank owes anything to the Chemical Bank by virtue of the loan." The former order of the court was therefore modified, and the decree of the Circuit Court was reversed and the cause remanded, with leave to the parties to adduce such additional evidence. 31 U. S. App. 75, 83; 65 Fed. Rep. 573, 577.

The cause was again heard in the Circuit Court, which said: "Upon the evidence, the finding of this court is that the power of the Fidelity Bank to borrow money by conducting such a transaction as is involved in this case is established, and that the same is legitimately within the business of banking under the National Bank Act." It found for the Chemical Bank on the issue defined in the mandate of the appellate court. 76 Fed. Rep. 339, 345, 347. The decree was in these words: "And the court being now fully advised, finds that the Fidelity National Bank upon the second day of March, 1887, borrowed from the complainant the sum of $300,000, and that on the 21st day of June, 1887, when the Fidelity National Bank was declared insolvent, there was due from the Fidelity National Bank to the complainant the said sum of $305,450; that dividends have been declared from the assets of the Fidelity National Bank to the creditors thereof at the dates and for the rates per centum, as follows, that is to say: October 31, 1887, the first dividend of 25 per centum; June 15, 1889, the second dividend of 10 per centum; June 30, 1890, the third dividend of 10 per centum; August 5, 1891, the fourth dividend of 5 per centum; August 15, 1894, the fifth dividend of 8 per centum. The court further finds that upon the 25th day of April, 1890, the defendant rejected the claim aforesaid of the complainant, which had been theretofore presented to him; and that after the previous decree of this court upon, to wit, the 25th day of July, 1892, said defendant paid to said complainant the sum of $100,000 upon account of the sum which might be due to the complainant pursuant to the provisions for that purpose made in the decree of this court, entered in this cause on the 8th day of July, 1892. The court finds that there is now due this 21st day of October, 1896, to the complainant

from the defendant the sum of $117,749.78, being the dividends aggregating 58 per centum heretofore declared from the assets of the Fidelity National Bank, computed upon the amount of the complainant's claim as herein allowed, with interest on those of said dividends which were declared prior to April 25, 1890, from said last-named day, and with interest upon those thereafter declared from the dates of their declaration, respectively, after crediting the said payment of $100,000, upon the 25th day of July, 1892, the computation being made upon the principle ordinarily applied in partial payments. It is therefore ordered, adjudged and decreed that the defendant pay to the complainant the said sum of $117,749.78, with interest thereon from said 21st day of October, 1896, and that hereafter, while any balance remains due the complainant upon said loan, said defendant pay to complainant dividends, calculated upon said sum of $305,450, like to those paid to other creditors of the Fidelity National Bank."

The receiver appealed from this decree, and the Circuit Court of Appeals affirmed the decree of the court below. The opinion of that court states fully the grounds upon which it held the case not to come within the rule announced in *Western National Bank* v. *Armstrong*, 54 U. S. App. 462; 83 Fed. Rep. 556.

From that decree the receiver has appealed to this court — the present appellant having succeeded Armstrong.

The principal contention of the appellant is that under the principles announced in *Western National Bank* v. *Armstrong* the Fidelity National Bank incurred no liability on account of the money obtained from the Chemical National Bank. But the appellee insists that the language of this court in that case, so far as it relates to the power of a national bank as incidental to its business to borrow money was much broader than was necessary for the determination of the issues then before the court, and if interpreted as is done by the appellant is in conflict with the adjudged cases, inconsistent with sound principle, and should be modified.

In the last-named case the Western National Bank of New York alleged that the Fidelity Bank was indebted to

it on account of a loan made May 28, 1887, "at the special instance and request of E. L. Harper, who was then the vice president and general manager of the said Fidelity National Bank, with full authority to make said loan on its behalf," and which loan, it was further alleged, was secured by collateral, signed by one Gahr and indorsed by Harper, and by the indorsement and delivery to the Western Bank by Harper of certificates for 1600 shares of the capital stock of the Fidelity Bank. It was also alleged that the collateral was without value and that the stock was wholly invalid and void. The Fidelity Bank denied that the Western Bank made any loan to it, or that it had any connection with or interest in the transaction referred to in the bill. The pleadings and evidence raised the question whether Harper, in his transactions with the New York bank, could legally bind the Fidelity Bank of which he was vice president. This court said : " It may be conceded that the New York bank acted upon the theory that the loan was to the Ohio bank, and took the notes and certificates of stock as collateral. But the liability of the Ohio bank is not a necessary consequence of such a concession. It has further to be shown that the Ohio bank was really a party to the transaction, either by having authorized Harper to effect the loan on its behalf, or by having ratified his action and having accepted and enjoyed the proceeds of the discount. There is no evidence whatever that the board of directors of the Fidelity National Bank gave any authority to Harper to borrow money on behalf of the bank, much less to borrow so enormous a sum on so long a time. In this respect the complainant's case stands barely on the assertion in the bill that ' Harper was the vice president and general manager of the Fidelity National Bank, with full authority to make said loan on its behalf.' The only evidence we find in the record tending to support such averment is found in the answer by J. Harvey Waters, the general bookkeeper of the Fidelity National Bank, on cross-examination, wherein he stated that E. L. Harper was the vice president and managing officer, and that by ' managing officer ' he meant that Harper was

the 'general manager of the business of the bank.' No
such officer as that of 'general manager' is known or named
in the National Bank Acts, nor does any such office exist
by usage.. The most that can be claimed in this case is
that Harper acted as the principal executive officer of the
bank. It cannot be pretended that, as such, he had power,
without authority from the board, to bind the bank by
borrowing $200,000 at four months' time. It might even
be questioned whether such a transaction would be within
the power of the board of directors. The powers expressly
granted are stated in the eighth section of the National
Bank Act (Rev. Stat. § 5136, par. 7): A national bank can
'exercise by its board of directors, or duly authorized officers
or agents, subject to law, all such incidental powers as shall
be necessary to carry on the business of banking, by dis-
counting and negotiating promissory notes, drafts, bills of
exchange and other evidences of debt; by receiving deposits;
by buying and selling exchange, coin and bullion; by loaning
money on personal security; and by obtaining, issuing and
circulating notes.' The power to borrow money or to give
notes is not expressly given by the act. The business of the
bank is to lend, not to borrow; to discount the notes of
others, not to get its own notes discounted. Still, as was
said by this court in the case of *First Nat. Bank of Charlotte*
v. *Exchange Nat. Bank of Baltimore*, 92 U. S. 122, 127,
'authority is thus given in the act to transact such a bank-
ing business as is specified, and all incidental powers neces-
sary to carry it on are granted.' These powers are such as
are required to meet all legitimate demands of the authorized
business, and to enable a bank to conduct its affairs, within
the general scope of its charter, safely and prudently. This
necessarily implies the right of a bank to incur liabilities in
the regular course of its business, as well as to become the
creditor of others. Nor do we doubt that a bank, in certain
circumstances, may become a temporary borrower of money.
Yet such transactions would be so much out of the course
of ordinary and legitimate banking as to require those
making the loan to see to it that the officer or agent acting

for the bank had special authority to borrow money. Even, therefore, if it be conceded that it was within the power of the board of directors of the Fidelity National Bank to borrow $200,000 on time, it is yet obvious that the vice president, however general his powers, could not exercise such a power unless specially authorized so to do, and it is equally obvious that persons dealing with the bank are presumed to know the extent of the general powers of the officers. Without pursuing this part of the subject further, we think it evident that Harper had no authority to borrow this money, and that the bank cannot be held for his engagements, even if made in behalf of the bank, unless ratification on the part of the bank be shown."

In the view we take of the present case it is not necessary to extend this opinion by a review of the numerous authorities which, it is contended, support the general proposition that a national bank is entitled under the law of its creation and in the conduct of its business to borrow money, and that the lender is not obliged to show that the officer or agent acting for the bank had special authority to negotiate the loan. If the present case depended upon that question it might be necessary to consider whether the language in *Western National Bank* v. *Armstrong* required modification.

It may be well, however, to observe that this court in *Auten* v. *United States Bank of N. Y.*, 174 U. S. 125, 141, 143, held that the borrowing of money was not out of the usual course of banking business. We said: "A power so useful cannot be said to be illegitimate, and declared as matter of law to be out of the usual course of business and to charge everybody connected with it with knowledge that it may be in excess of authority. It would seem, if doubtful at all, more like a question of fact, to be resolved in the particular case by the usage of the parties or the usage of communities." It is important also to observe that the court said that *Western National Bank* v. *Armstrong* was not to be regarded as an adjudication to the contrary.

We may further observe that the last-named case differs from the present case in many important particulars.

In *Western National Bank* v. *Armstrong* the defendant bank did not receive or get the benefit of the money alleged to have been loaned to it at the instance of its vice president. This court took care in that case to say that it did " not appear that the bank ever got a penny of the borrowed money or any benefit or advantage whatever by reason of the. transaction."

In the present case it appears that the following letter, under date of February 28, 1887, and signed by E. L. Harper as vice president of the Fidelity Bank, was addressed to the cashier of the Chemical Bank : " Enclosed herewith we hand you for credit our certificate of deposit No. 345 for $300,000, with bills as collateral, as follows : [Here was given a list of twenty-seven notes]. We desire to keep a large reserve with you, and we trust you will make the rate as low as you proposed some time since. Please place the amount to our credit and advise the rate." This letter having been received by the Chemical Bank, its cashier wrote to the cashier of the Fidelity Bank under date of March 2, 1887: " Your favor of the 28th inst. has been received. We credit Fidelity National Bank $300,000, and shall be considerate as to the rate of interest when the loan is paid." Before this last letter could have reached Cincinnati the bookkeeper of the Fidelity Bank, acting under instructions from Harper, credited him personally on the books of that bank with $300,000. But the credit of $300,000 given to the Fidelity Bank on the books of the Chemical Bank remained unaltered, and that amount was drawn from the latter bank in the ordinary course of business on the authorized checks of the Fidelity Bank and went to discharge its legal obligations. And it may be added that the Fidelity Bank had notice of the above credit in its favor; for besides other evidence, it was shown that in the monthly statement sent by the Chemical Bank to the Fidelity Bank covering the transactions of March, 1887, there appeared under the date of March 2d a credit to the Fidelity Bank as follows : " Tem. loan, $300,000."

We have then a case in which a national bank having used in its business money which its vice president obtained as a loan to it from another national bank denies all liability to.

account for the same upon the ground that the loan was not negotiated by it or by its direction, as well as upon the ground that it could not itself have legally borrowed the money from the other bank. Do the statutes relating to national banking associations require that such a defence be sustained? This question is recognized by the court as one of great importance, and has received careful consideration in the light of the adjudged cases. We proceed to the examination of those cases.

In *Merchants' Bank* v. *State Bank*, 10 Wall. 604, 644, in which one of the questions was as to the liability of a bank on account of certain certificates issued by its cashier and of certain purchases of gold made by him, the court said that if the certificates and the gold actually went into the bank which the cashier assumed to represent, then the bank was liable for money had and received, whatever may have been the defect in the authority of the cashier to make the purchase.

In *Marsh* v. *Fulton County*, 10 Wall. 676, 684, it was held that "the obligation to do justice rests upon all persons, natural and artificial, and if a county obtains the money or property of others without authority, the law, independently of any statute, will compel restitution or compensation."

In *United States* v. *State Bank*, 96 U. S. 30, 36, which were actions brought in the Court of Claims against the United States to recover the amount of certain gold certificates deposited in the subtreasury at Boston and forwarded, after being cancelled, to the Treasurer of the United States, and in which transactions fraud was imputed to the cashier of the subtreasury at Boston, this court said: "In these cases, and many others that might be cited, the rules of law applicable to individuals were applied to the United States. Here the basis of the liability insisted upon is an implied contract by which they might well become bound in virtue of their corporate character. Their sovereignty is in nowise involved. . . . Surely it ought to require neither argument nor authority to support the proposition that, where the money or property of an innocent person has gone into the coffers of the

nation by means of a fraud to which its agent was a party, such money or property cannot be held by the United States against the claim of the wronged or injured party. The agent was agent for no such purpose. His doings were vitiated by the underlying dishonesty, and could confer no rights upon his principal."

The rule was illustrated in *Louisiana* v. *Wood*, 102 U. S. 294, which was an action against a municipal corporation to compel it to repay money received and paid into its treasury on account of bonds sold by it but which it had issued without authority of law. This court held that the law implied from what was done a contract that the city would return the money paid to it by mistake. To the same effect is *Chapman* v. *Douglas County*, 107 U. S. 348, 355 *et seq.*

In *Parkersburg* v. *Brown*, 106 U. S. 487, 503, it appeared that the city of Parkersburg, West Virginia, pursuant to an act of the legislature of that State, issued its bonds to be loaned to persons engaged in manufacturing and to be secured by deed of trust or mortgage on real estate. The bonds were held to be void under the principles announced in *Loan Association* v. *Topeka*, 20 Wall. 655, and the question arose whether the city was bound to account for the property conveyed to it in trust to secure bonds so issued and loaned to persons engaged in manufacturing. This court said : " Notwithstanding the invalidity of the bonds and of the trust, the O'Briens had a right to reclaim the property and to call on the city to account for it. The enforcement of such right is not in affirmance of the illegal contract, but is in disaffirmance of it, and seeks to prevent the city from retaining the benefit which it has derived from the unlawful act. 2 Com. Cont. 109. There was no illegality in the mere putting of the property in the hands of the city. To deny a remedy to reclaim it is to give effect to the illegal contract. The illegality of that claim does not arise from any moral turpitude. The property was transferred under a contract which was merely *malum prohibitum*, and where the city was the principal offender. In such a case the party receiving may be made to refund to the person from whom it has received

property for the unauthorized purpose, the value of that which it has actually received. *White* v. *Franklin Bank*, 22 Pick. (Mass.) 181; *Morville* v. *American Tract Society*, 123 Mass. 129; *Davis* v. *Old Colony Railroad*, 131 Mass. 258, 275, and cases there cited."

In *Read* v. *Plattsmouth*, 107 U. S. 568, 575, where the question was as to the validity of bonds issued by a municipal corporation, the court said: "In the present case the statute in question does not impose upon the city of Plattsmouth, by an arbitrary act, a burden without consent and consideration. On the contrary, upon the supposition that the bonds issued, as to the excess over $15,000, were void, because unauthorized, the city of Plattsmouth received the money of the plaintiff in error, and applied it to the purpose intended, of building a schoolhouse on property the title to which is confirmed to it by the very statute now claimed to be unconstitutional, and an obligation to restore the value thus received, kept and used immediately arose."

A case aptly illustrating the principle adverted to is *Logan County Bank* v. *Townsend*, 139 U. S. 67, 74, 78. The facts in that case were these: Townsend, it was alleged, sold to the Logan County National Bank, through its cashier, bonds of a railroad corporation in consideration of a named sum and the agreement of the bank that it would, upon his demand, replace the bonds to him at the same price or less. The bank refused to comply with the agreement to replace the bonds, and Townsend sued to recover from it the damages sustained by him, to wit, the difference between the price paid by the bank and the value of the bonds. The bank, in its defence, denied that it had any connection with the transaction between Townsend and its cashier otherwise than that the latter having deposited the proceeds in the bank it had paid them to the plaintiff. Its principal defence was that the cashier as such had no authority to make the contract set out, and that the defendant had itself no right, power or authority to make it. Taking it to be true, as found by the jury, that the alleged agreement was made by the cashier for the bank and not upon his individual account, and assuming from the record

that the bank held the bonds at the time Townsend sued, this court said: "If it be assumed, in accordance with the bank's contention, that it was without power to purchase these bonds, to be replaced to the plaintiff on demand, the question would still remain whether, notwithstanding the act of Congress defining and limiting its powers, it was exempt from liability to the plaintiff for the value of the bonds, if it refused, upon demand, to replace or surrender them at the same or a less price. It would seem, upon defendant's theory of its powers, to be too clear to admit of dispute that the act of Congress does not give a national bank an absolute right to retain bonds coming into its possession by purchase under a contract which it was without authority to make. True it is not under a duty to surrender possession until reimbursed the full amount due it; it has the right to hold the bonds as security for the return of the consideration paid for them; but when such amount is returned, or tendered back to it, and the surrender of the bonds is demanded, its authority to retain them no longer exists. And from the time of such demand and its refusal to return the bonds to the vendor or owner, it becomes liable for their value upon grounds apart from the contract under which it obtained them. It could not rightfully hold them under or by virtue of the contract, and at the same time refuse to comply with the terms of purchase. If the bank's want of power under the statute to make such a contract of purchase may be pleaded in bar of all claims against it based upon the contract — and we are assuming, for the purposes of this case, that it may be — it is bound upon demand, accompanied by a tender of the price paid, to surrender the bonds to its vendor. The bank, in this case, insisting that it obtained the bonds of the plaintiff in violation of the act of Congress, is bound, upon being made whole, to return them to him. No exemption or immunity from this principle of right and duty is given by the national banking act." Again: "Our conclusion upon the whole case, so far as the questions arising in it may be reviewed by this court, is, that if the bank had no authority to purchase the bonds in question, it is yet not exempt, by reason of anything

in the national banking act, from liability to the plaintiff for the difference between the price it paid for them and their value at the time it refused, upon plaintiff's demand, to comply with the contract made by it for their purchase and held on to the bonds."

In *Central Transportation Company* v. *Pullman's Car Company*, 139 U. S. 24, 60, which involved the validity of a certain contract whereby one corporation leased and transferred all its cars, contract rights and personal property to another corporation, and which lease was held to be void, this court said : " A contract *ultra vires* being unlawful and void, not because it is in itself immoral, but because the corporation, by the law of its creation, is incapable of making it, the courts, while refusing to maintain any action upon the unlawful contract, have always striven to do justice between the parties, so far as could be done consistently with adherence to law, by permitting property or money, parted with on the faith of the unlawful contract, to be recovered back, or compensation to be made for it.   In such case, however, the action is not maintained upon the unlawful contract, nor according to its terms ; but on an implied contract of the defendant to return, or, failing to do that, to make compensation for, property or money which it has no right to retain.   To maintain such an action is not to affirm, but to disaffirm, the unlawful contract."   This principle was recognized and enforced in *Pullman's Car Company* v. *Transportation Company*, 171 U. S. 138, 151, in which it was said : " The right to a recovery of the property transferred under an illegal contract is founded upon the implied promise to return or make compensation for it."

In *Dittey* v. *Dominion National Bank of Bristol*, 43 U. S. App. 613, 615, which was an action against a receiver of a national bank to recover the amount of a loan made by its president without the knowledge of the directors and for which he gave the note of the bank — the object of the transaction being to cover up certain frauds of the president — the court, speaking by Judge Taft, said : " In our opinion, even if the president may not have had authority to effect the loan, yet when he, in order to conceal his previous embezzlement,

deposited the sum to the credit of the Citizens' Bank with its reserve agent in New York, and it was checked out for the benefit of the bank, the bank and its board of directors were affected with the knowledge which Overman as its president had of the receipt of the moneys. Having received the benefit through an agent, it is affected with the burden of the notice which that agent had of its reception; and therefore it became liable for money had and received to its use from the Dominion Bank. We think the same principle applicable in this case which was applied in the case of *Atlantic Cotton Mills* v. *Indian Orchard Mills*, 147 Mass. 268. In that case the treasurer of two corporations was a defaulter in both positions. The defalcations were of long standing, and to avoid discovery at the annual settlement of one company he drew checks of the other and deposited them to the credit of the one company in the bank. The question was whether the company whose bank account had been swelled by the checks of the other was a debtor to the other for the deposits thus made by the common treasurer. It was held that the company receiving the money, having received it through the sole agency of the man who knew it to be stolen, could only take and hold it with the burden of his knowledge. So in this case the bank, having received the money through the agency of its president, could not retain it without assuming the burden of the president's knowledge as to how it came to be obtained. We do not see that the circumstance in one case that the treasurer stole the money and in the other that the president obtained it on the false representation that he was authorized to borrow it for his bank makes any reasonable distinction between the two cases."

In *Perkins* v. *Boothby*, 71 Maine, 91, 97, the question was as to the liability of a joint stock company on account of notes given by its agent for money loaned and which was appropriated to the payment of the company's debts. The directors had no knowledge of the loan or the appropriation of the money, unless knowledge could be implied from the fact that those acts were done by the agent. The defence was that the agent's want of authority to effect the loan relieved the com-

pany from responsibility not only on the notes but for any claim under the common counts for money had and received. After observing that although the directors upon receiving notice of the acts of the agent in terms repudiated them, yet after knowledge of the facts retained the benefit of the loans effected and used the money in discharge of valid claims against the company which would have been in force except for the unauthorized acts of the agent, the court said: " 'If liable in one case why should not a corporation be always liable to refund the money or property of a person which it has obtained improperly and without consideration, or if unable to return it, to pay for the benefit obtained thereby? To say that a corporation cannot sue or be sued upon an *ultra vires* arrangement is one thing. To say that it may retain the proceeds thereof which have come into its possession without making any compensation whatever to the person from whom it has obtained them, is something very different, and savors very much of an inducement to fraud.' Green's Brice's Ultra Vires, 618. The question whether upon reason and authority the application of this principle should be extended to municipal corporations, or whether, on the contrary, the purposes for which such bodies are organized, the limited powers conferred upon them, as well as considerations of public policy and safety, may remove them from such liability, is one of great importance. It does not arise in this case."

In *Bank of Lakin* v. *National Bank*, 57 Kansas, 183, a bank was held liable for the amount of certain notes executed in its name by its cashier without its authority, but the proceeds of which were received by the bank, the court saying that "a principal cannot receive the benefits of a transaction and at the same time deny the authority of the agent by whom it was consummated."

Without further citation of cases we adjudge, both upon principle and authority, that as the money of the Chemical Bank was obtained under a loan negotiated by the vice president of the Fidelity Bank who assumed to represent it in the transaction, and as the Fidelity Bank used the money so obtained in its banking business and for its own benefit, the

latter bank having enjoyed the fruits of the transaction cannot avoid accountability to the New York bank, even if it were true as contended that the Fidelity Bank could not consistently with the law of its creation have itself borrowed the money. When, as the result of its arrangement with Harper as vice president, the Chemical Bank credited the Fidelity Bank on its books with the sum of $300,000 the former thereby undertook to pay the checks of the latter to the extent of that credit. And, as already stated, that credit was fully exhausted by the payment of the checks of the Fidelity Bank drawn in the ordinary course of its business. If the latter bank in this way used the money obtained from the Chemical Bank, it is under an implied obligation to pay it back or account for it to the New York bank. It cannot escape liability on the ground merely that it was not permitted by its charter to obtain money from another bank. Suppose the Fidelity Bank by its check upon the Chemical Bank had drawn the whole $300,000 at one time and now had the money in its possession unused? It would not be allowed to hold the money even if it were without power under its charter to have borrowed it from the Chemical Bank for use in its business. Or suppose a national bank, in violation of the act of Congress, takes as security for a loan made by it a deed of trust of real estate, and subsequently causes the property to be sold and the proceeds applied in payment of its claim against the borrower, a surplus being left in its hands, which it uses in its business or in discharge of its obligations. If sued by the borrower for the amount of such surplus, could the bank successfully resist payment upon the ground that the statute forbade it to make a loan of money on real estate security? Common honesty requires this question to be answered in the negative. But it could not be so answered if it be true that the Fidelity Bank could use in its business and for its benefit money obtained by one of its officers from another bank under the pretence of a loan, and be discharged from liability therefor upon the ground that it could not itself have directly borrowed from the other bank the money so obtained and used. There is nothing in the acts of Congress authorizing or permitting a national bank to appro-

priate and use the money or property of others for its benefit without liability for so doing. If the Fidelity Bank did not itself borrow this money from the Chemical Bank, although the latter bank in good faith believed that it did, then the crediting of the former on the books of the latter with $300,000 was a mistake of which the Fidelity Bank was not entitled in equity and good conscience to take advantage and from which it should not be permitted to derive profit to the prejudice of the other bank. So if the Fidelity Bank took the benefit of that credit with knowledge of all the facts, then its defence is without excuse and immoral. If it innocently availed itself of that credit without knowledge of the facts, the principles of natural justice demand that it be held accountable for the money of another bank which it used in its business without giving any consideration therefor.

The fact that after the Fidelity Bank had been credited on the books of the Chemical Bank with the $300,000, Harper fraudulently caused himself to be credited on the books of the Fidelity Bank with a like sum, is a matter with which the Chemical Bank had no connection and cannot affect its right to demand a return of the money which went (as the Chemical Bank in good faith supposed it would) into the treasury of the Fidelity Bank and was by it used in meeting its current obligations. The dishonesty of Harper in his management of the affairs of the Fidelity Bank did not discharge that bank from the obligation under which it came by using in its business the money obtained by its vice president under the guise of a loan to the bank.

It is no defence to the claim of the Chemical Bank to say that the directors of the Fidelity Bank were unaware of the fraudulent acts of Harper. We do not rest our conclusion in the present case upon any question as to diligence or want of diligence upon the part of directors. We rest it upon the fact and the implied obligation arising therefrom that the Fidelity Bank used in its business and for its benefit the money which the Chemical Bank placed to its credit in consequence of a loan negotiated by Harper, who assumed to represent it.

Independently therefore of any question as to the scope of the power of a national bank to borrow money to be used in its business, we hold that the Fidelity Bank became liable to the Chemical Bank by using the money obtained from the latter, under the arrangement made by Harper in his capacity as vice president; consequently, the decree recognizing the claim, of the Chemical Bank for the amount of the loan of March, 1887, was right.

· 2. It is assigned for error that the collections from collaterals securing the alleged loan prior to the declaration of dividends by the receiver were not deducted from the amount of such loan in determining the sum upon which dividends should be paid to the Chemical Bank, and that the Chemical Bank was not required first to exhaust its collateral security and apply the proceeds on its claim before proving it against the receiver for dividends.

This assignment of error was prepared by counsel prior to the decision of this court in *Merrill* v. *National Bank of Jacksonville*, 173 U. S. 131, 135, 146, 147, in which case this court said that the inquiry on the merits was whether a secured creditor of an insolvent national bank may prove and receive dividends upon the face of his claim as it stood at the time of the declaration of insolvency, without crediting either his collaterals or collections made therefrom after such declaration, subject always to the proviso that dividends must cease when from them and from collaterals realized the claim has been paid in full. It was held that in the distribution of insolvent estates, " the secured creditor is a creditor to the full amount due him when the insolvency is declared, just as much as the unsecured creditor is, and cannot be subjected to a different rule. And as the basis on which all creditors are to draw dividends is the amount of their claims at the time of the declaration of insolvency, it necessarily results, for the purpose of fixing that basis, that it is immaterial what collateral any particular creditor may have. The secured creditor cannot be charged with the estimated value of the collateral, or be compelled to exhaust it before enforcing his direct remedies against the debtor, or to surrender it as a condition thereto,

though the receiver may redeem or be subrogated as circumstances may require." " When secured creditors have received payment in full, their right to dividends and their right to retain their securities cease, but collections therefrom are not otherwise material. Insolvency gives unsecured creditors no greater rights than they had before, though through redemption or subrogation or the realization of a surplus they may be benefited."

3. It is also insisted that the Chemical Bank should have been required to deduct from its claim the amount, principal and interest, of the note for $25,000 indorsed by J. V. Lewis, who, it is alleged, was released because of its failure to take the steps required by the rules of commercial law in order to charge him as indorser. Upon this point the Circuit Court of Appeals, upon the first hearing of this case, said : " Our conclusion upon this main question in the case makes it unnecessary for us to consider the other questions discussed by counsel, which were material only in view of the position taken by the court below on the issue just considered. If the Chemical Bank should receive from dividends and collections payment of debt, principal and interest, now owing to it by the Fidelity Bank, the question would arise whether it could not properly be charged with the note for $25,000 which, through negligence, it failed to collect. It is quite clear, however, that dividends declared and to be declared, together with all collections from collaterals, including as such the note just referred to, will fall far short of paying the $300,000 and interest due the Chemical Bank on the original debt. The question suggested, therefore, does not arise on the facts of the case." 16 U. S. App. 465, 539 ; 59 Fed. Rep. 372, 382. We concur in that view.

Having noticed all the questions that require consideration, the decree below is

*Affirmed.*