PENSACOLA BANK AND TRUST COMPANY, *Plaintiff in Error*, v. THE NATIONAL BANK OF ST. PETERSBURG, *Defendant in Error*.

1. A bank dealing with the cashier of another bank, who is permitted by the directors to have complete control of its business relations with other banks has a right to trust in the integrity of the cashier of the latter, and transact business with him accordingly, where there is nothing in the known state of affairs of the latter bank or of the cashier's relation to it, to excite suspicion that he is using his position to the prejudice of his bank.

2. S. was the cashier of a bank in the city of P. and was permitted by the directors to have complete control over the dealings of his bank with other banks, and of its mail. In February, 1907, he, in behalf of his bank entered into business

348        SUPREME COURT OF FLORIDA.

Pensacola B. & T. Co. v. N. B. of St. Petersburg—Opinion of Court.

relations with a bank at St. P. by which his bank was to keep a balance of $5,000.00 with the bank of St. P. and the latter would receive certain collections for the former bank and credit the same to bank at P. A business of several thousand dollars a month was thus carried on between the two banks, including the discounting of a note by one of the stockholders of the P. bank, which was finally charged up to the P. bank at the request of S. On the 26th of July, 1907, S. wrote the cashier of the St. P. bank enclosing his own note for $5,000.00 accompanied by good collateral, and requested that his note be discounted and the proceeds placed to the credit of the P. bank. This was done, and on September 11th, 1907, at the request of S. this note was charged up to the P. bank and the collateral returned to it. Regular monthly statements showing these and all other transactions were sent by the St. P. bank to the P. bank and no objection to the charging of S's note to the P. bank was made until the latter part of November, 1907. In a suit by the P. bank against the St. P. bank to recover the amount of the $5,000.00 note of S. which was charged up to the P. bank, it is held that under this statement of facts the P. bank is not entitled to recover.

This case was decided by Division B.

Writ of error to the Circuit Court for Hillsborough County.

The facts in the case are stated in the opinion of the court.

*Blount & Blount & Carter* and *F. M. Simonton,* for Plaintiff in Error;

*P. O. Knight* and *C. C. Whitaker,* for Defendant in Error.

HOCKER, J.—The Pensacola Bank & Trust Company, a corporation organized under the laws of Florida, sued the National Bank of St. Petersburg, Florida, in the

Circuit Court of Hillsborough County, in an action at law, in February, 1908. The declaration contained counts for $5,000, money received, for a like sum moneys expended, for a like sum work and labor, for a like sum moneys delivered and wrongfully paid out on the individual note of G. C. Scudamore, for a like sum of money of plaintiff used by the defendant, for a like sum of money found to be due plaintiff on account stated. The damages claimed are $10,000.00. A bill of particulars is attached to the declaration. The defendant pleaded it was never indebted, it did not promise as alleged, and payment. The case was tried on these pleas. After the evidence was all submitted and the law of the case was being considered by the Circuit Judge on sundry instructions which were presented to him by the parties, the Judge announced his view of the case to the effect that in his opinion the plaintiff was not entitled to recover. He then instructed the jury to find a verdict for the defendant which it did, and a judgment in favor of the defendant was then entered. The plaintiff has brought the case here on a number of assignments of error. We have read the evidence with care, and with our view of the law applicable thereto we are unable to see that the Circuit Judge erred.

The National Bank of St. Petersburg was organized as a National Bank in 1905. Mr. T. K. Wilson was its Cashier before and during the time when the transactions occurred which brought about the litigation in this case. The Pensacola Bank and Trust Company was organized as a State Bank in January, 1907, and G. C. Scudamore was its Cashier. Scudamore and Wilson came to this State from Kentucky, were acquainted and had business relations with each other before coming to this State. In February, 1907, Scudamore the Cashier of the Pensacola Bank, wrote to Wilson, the Cashier of

the St. Petersburg Bank, offering to enter into business relations on the part of his Bank with the latter bank, which he represented would be of advantage to both banks. He offered on the part of his bank to keep an average balance of $5,000 with the St. Petersburg Bank on the condition that the latter bank should receive certain collections for the former and credit the same to the Pensacola Bank—in other words in the phraseology which they use—to clear its collecting items at par. These terms were accepted and an account was opened in February, 1907, by the Pensacola Bank with the St. Petersburg Bank. It seems that the first item of this account was a note of $5,000 made by a Mr. Gordon who seems to have been a stockholder in the Pensacola Bank and the note was intended to raise money to pay for his stock in the latter bank. Scudamore wrote Wilson that he was anxious to interest Gordon in the bank and that later on if Gordon wanted to carry the note the Pensacola Bank would take it from the St. Petersburg Bank and carry it. The note was renewed with the St. Petersburg Bank and on August 20, 1907, at the request of Scudamore was charged to the account of the Pensacola Bank. No objection appears to have been made to this action by the Pensacola Bank, though a statement was sent it showing the transaction. The business thus begun between the two banks continued from February, 1907, until sometime in November, 1907. The accounts filed show that it amounted to several thousand dollars each month. The St. Petersburg Bank seems to have paid most of its indebtedness to the Pensacola Bank in New York Exchange at the request of the latter. On the 26th of July, 1907, Scudamore wrote Wilson enclosing his own individual note for $5,000 to the St. Petersburg Bank and requested the latter to discount the note and place the proceeds to the credit of the Pensacola Bank. This

note was accompanied by collateral security in the form of a note for $5,000 executed to Scudamore personally by parties who are represented as perfectly good for the amount. The note was discounted by the St. Petersburg Bank on the 29th of July, 1907, as requested by Scudamore, and the proceeds, $4970.00, was placed to the credit of the Pensacola Bank. On September 11, 1907, at Scudamore's request, this note was charged to the account of the Pensacola Bank and the collateral security returned with the note. A monthly statement showing this transaction was sent to the Pensacola Bank containing this request: "If your account is incorrect notify at once," and no objection was made to it until the 27th of November, 1907, when Mr. Bass, the President of the Pensacola Bank, wrote to Mr. Wilson, the Cashier of the St. Petersburg Bank, stating that the latter had no right to charge the note of Scudamore for $5,000 to the Pensacola Bank, and demanding that the amount be sent to the latter by return mail. On the 30th of November, 1907, Cashier Wilson answered this letter and stated that the understanding was when the loan was made it would at maturity be charged to the Pensacola Bank; that he simply carried out instructions, and that so far as the St. Petersburg Bank was concerned the matter was closed. Up to this time all of the business correspondence on the part of the Pensacola Bank with the St. Petersburg Bank, and all the financial arrangements between them were conducted by Scudamore exclusively. After this time a good deal of correspondence took place between the two banks in regard to this Scudamore note, the St. Petersburg Bank maintaining that it was fully authorized to do what it had done. About this time the financial panic of 1907, was becoming acute, and the officers of the Pensacola Bank seem to have begun to take some interest in the affairs of the bank. An inves-

352        SUPREME COURT OF FLORIDA.

Pensacola B. & T. Co. v. N. B. of St. Petersburg—Opinion of Court.

tigation was made and it was found that Scudamore had
appropriated over $70,000 of the money of the bank. It
was discovered that on the 26th of June, 1907, he had
appropriated $2,500 of the Pensacola Bank's cash and had
charged the same to the St. Petersburg Bank, and left
the books in such shape that the matter could not be
traced any further. On July 27th, 1907, Scudamore
charged the St. Petersburg Bank on the books of the
Pensacola Bank with $2,500 and credited himself on his
individual account with that amount. There is no evi-
dence to show that the St. Petersburg Bank had any
knowledge of these transactions, and no evidence that
any one of the directors or officers of the Pensacola Bank
knew of them until sometime in the latter part of No-
vember, 1907, or even later, when the books of the latter
were examined by an Auditing Company.

Mr. Wentworth testified that he was a director of the
Pensacola Bank from the opening of the bank until about
1st of January, 1908; that his bank did not have a
finance committee whose duty it was to reconcile state-
ments of accounts between his and other banks doing
business with it; that Scudamore generally attended to
this; that he does not know who received the various
statements sent to the Pensacola Bank by other banks;
that he was not present when the mail came in, did not
examine these statements until after this trouble arose
about the 24th of November, when "we commenced to
examine them," and found that the St. Petersburg Bank
had charged the Scudamore note of $5,000 to the Pensa-
cola Bank.

Miss Waggenheim testified that she occupied the posi-
tion of stenographer for the Pensacola Bank and Trust
Company from the time it was organized; that Scuda-
more had charge of the opening of the mail in that insti-
tution; that she never saw any one else connected with

the bank open its mail during the time she had been there; that the mail was brought to him by the porter and he opened and distributed it.

Mr. F. A. Wood, the President of the St. Petersburg Bank testified that he attended closely to the affairs of his own bank; that Scudamore was the only officer of the Pensacola Bank with whom they ever did any business; that he had his signature and did not have that of any other officer of the bank; that if his bank had not discounted the $5,000 note of Scudamore and placed the proceeds to the credit of the Pensacola Bank the latter's account with his bank would have been overdrawn for the month of July; that he had no suspicion that Scudamore was dishonest; that if he had known for a moment the Pensacola Bank and Trust Company would repudiate Scudamore's instructions about charging his note to the Pensacola Bank he would have proceeded to collect it on the collateral, which was good; that he did not think for a moment the Pensacola Bank would repudiate those instructions of its Cashier, as he had been following out the instructions of its Cashier all along, and his bank sent the note with the collateral back to the Pensacola Bank, or to Scudamore, Cashier, of said Bank, by the latter's instructions.

The charging of the Scudamore note of $5,000 to the Pensacola Bank is the foundation of this suit against the St. Petersburg Bank. Quite a number of objections to testimony introduced by the defendant on the trial showing instructions from Scudamore authorizing this charge were made, and the rulings permitting it are assigned as error. It seems to us however that it was proper to admit the correspondence and instructions from Scudamore, and all other evidence tending to throw light upon the course of dealing between the two banks. It is in-

23—Vol. 59.

sisted by the plaintiff in error that Scudamore was simply the Cashier of the Pensacola Bank, and an agent, and that an agent cannot bind his principal when he is known to be acting for himself, and his interest is adverse to that of his principal. Several cases are cited by the plaintiff in error in which this principle is applied to the Cashiers and Presidents of banks.

In the case of Hier, Administrator, v. Miller, Receiver, 68 Kan. 258, 75 Pac. Rep. 77, 63 L. R. A. 952, it is held that a Cashier of a bank has no implied authority to pay his individual debts by entering the amount of them as a credit upon the pass book of his creditor who keeps an account with the bank, and permitting the creditor to exhaust such account by checks which are paid, the bank having received nothing of value in the transaction; that the personal interest of the Cashier was sufficient to put the creditor on notice, and that he was liable to the bank for the amount he thus received.

In the case of Chrystie v. Foster, 61 Fed. Rep. 551, 9 C. C. A. 606, the principle is applied as follows: "C in order to obtain a credit on his personal account with a bank of which he was the president, procured the defendants, a banking firm, to discount his individual note, credit the amount to the bank, and notify the bank that he had deposited the amount with them to the credit of the bank. The bank had previously given C credit for the amount, and after being notified by the defendants that the deposit had been actually made with them, allowed C to overdraw his account. Thereafter, and while his account with the bank was overdrawn, C, in his official character as President authorized the defendants to charge the note to the account of the bank, and the defendants did so. Held, in a suit by the Receiver of the bank to recover the deposit that unless expressly authorized to do so, the President of the bank could not

use the funds of the bank to pay his personal obligation, and there being no proof of such express authority, the authorization given by him to the defendants was not a defense to the claim."

An examination of the facts of that case as they appear in the opinion shows them to be different from those of the instant case. In that case Collins was President of the Cheyenne National Bank. In order to credit himself with $10,000.00 in his own bank for his own use, he procured the defendants, a banking firm of New York to take his note for $10,000, and to notify his bank he had deposited with them that amount to the credit of his bank. The banking firm did so, and wrote Collins' bank: "Your account is credited this day $10,000 for use J. W. Collins with you." It is stated that the defendants knew Collins was representing himself and not his bank, and that the object of the transaction was to give Collins a personal credit with the bank for $10,000.00. In the instant case the evidence does not show that the St. Petersburg bank knew, or had reason to believe that Scudamore was acting for himself in having his personal note discounted and placed to the credit of his bank. The most rational conclusion to be placed on this act was that he was acting for his bank and lending it his personal credit to keep up the balance of $5,000.00 to the credit of his bank with the St. Petersburg Bank as he had promised to do. There was nothing to indicate to the latter bank, so far as we can discover, that Scudamore was making this transaction a basis for taking money out of the Pensacola Bank, or of getting personal credit with it. It is clear from the evidence that no officer of the Pensacola Bank ever gave the St. Petersburg Bank any such information either by letter, statement, or otherwise, until sometime after the Scudamore note had been charged to the Pensacola Bank, and

356        SUPREME COURT OF FLORIDA.

Pensacola B. & T. Co. v. N. B. of St. Petersburg—Opinion of Court.

this note with its collateral security and been returned to the Pensacola Bank or its Cashier, and the money derived from its discount had been paid out on the order of the Pensacola Bank, and a statement rendered showing these facts, and no timely objection was made to the transaction.

In the case of Burton, Receiver, v. Burley, Receiver, 13 Fed. Rep. 811, it is held that "where the President of a National Bank instructed its correspondent bank to charge up against the bank of which he was President, the amount of a note given by him in payment of such a note, and an account was rendered showing the transactions, the bank was estopped from denying the correctness of the charge in an action by a receiver, subsequently appointed, seeking to set aside the transaction." The facts in this case are nearly analogous to those of the instant case. In the course of the opinion the court says: "What security can there be in the business relations between banks if accounts of this kind are not considered conclusive and binding upon the respective banks, unless indeed, there is a mistake, or it can be shown that there has been a fraud practiced upon the bank against which the charges are made, and that fraud known to the other bank or its officers? Unless that can be done, there would be no safety in the transactions of banks with each other. One bank would never know what to do on instruction given, or a charge made. Here is an individual account which one bank has against a particular person. Another bank with which it is transacting business, and with which it has an account, instructs that bank to charge this individual indebtedness to it. The charge is made, and the account is rendered showing it is done, and the bank which makes the charge knows nothing of any wrong being done, or of any mistake or of any fraud being practiced by the officers of the bank.

That being so it must foreclose the bank, or else banks must cease doing business with each other. And it ought to be so. Where a bank established under an act of Congress, or any other way elects its own officers, the men who are interested in the bank—the stockholders, the depositors—ought to be bound by the authorized acts of the officers, or those which appear to be authorized whether they are or not, and by the general usage of banks."

In the case of Merchants' Bank v. State Bank, 10 Wall. (U. S.) 604, the Supreme Court of the United States held that: "Evidence of powers habitually exercised by a cashier of a bank, with its knowledge and acquiescence defines and establishes as to the public those powers provided that they be such as the directors of the bank may, without violation of its charter confer on such cashier."

In the case of Chemical Nat. Bank of New York v. Armstrong, 76 Fed. Rep. 339, it is laid down as law that "a bank dealing with the chief executive officer of another bank has a right to trust in his integrity, and transact business with him accordingly, there being nothing in the known state of the affairs of his bank or his relations to it, to excite suspicion." In this case the powers of executive officers of banks are discussed and it is clearly shown that they cannot from the nature of the business in which banks are engaged be always limited by the rules which govern ordinary agencies.

The facts in the case of Aldrich v. Chemical Nat. Bank, 176 U. S. 618, 20 Sup. Ct. Rep. 498, are stated as follows: "H. as Vice-President of a Cincinnati Bank made application to a New York Bank for a loan of $300,000.00. The request was granted and that amount was placed to the credit of the Cincinnati Bank upon the books of the New York Bank. Immediately thereafter H. fraudulently caused himself to be personally credited upon the books of his own bank with a like sum of $300,000.00. The

358    SUPREME COURT OF FLORIDA.

Pensacola B. & T. Co. v. N. B. of St. Petersburg—Opinion of Court.

action of H. in negotiating the above loan with the New York Bank was unauthorized by the Board of Directors of the Cincinnati Bank, but after the arrangement had been made, that bank drew out by check the money that had been placed to its credit by the New York Bank and used the same in discharging its valid obligations." On these facts "it is held that by so using the money obtained from the New York Bank by H. in his capacity as Vice-President, the Cincinnati Bank became bound to account for the same as for money had and received, and could not escape liability to the New York Bank upon the mere ground, supposing it to be true, that it was not permitted by its charter to borrow money. The fraud perpetrated by H. upon his own bank in having himself personally credited upon its books with the amount of the loan was a matter with which the New York Bank had no connection, and its rights to recover could not be affected thereby. The liability of the Cincinnati Bank rested upon the fact, and the implied obligation arising therefrom, that that bank used in its business and for its benefit the money which the other bank placed to its credit in consequence of the loan negotiated by H. who assumed to represent it." See the reasoning of Mr. Justice HARLAN in the opinion. We see no reason why the rule thus laid down should not be applied in the instant case. The greater part if not the whole of the proceeds of the Scudamore note credited to the Pensacola Bank were used by the latter bank in its business and we can see no reason why it should again recover it in this action. If instead of giving his own note to the St. Petersburg Bank Scudamore had given the note of the Pensacola Bank, and it had been discounted and the proceeds used by the latter bank we do not think it could be contended that it would not have been liable on the note to the St. Petersburg Bank. But the result is just the same as if this had been

VOL. 59, JANUARY TERM, 1910. 359

Pensacola B. & T. Co. v. N. B. of St. Petersburg—Opinion of Court.

done. An examination of the cases shows that it is impossible to formulate a definition of the duties of a cashier that will be applicable to all cases. See Morse on Banks and Banking (4th ed.) Paragraph 151-180 inclusive. He is said to have several inherent powers (Paragraph 153 *supra*) among them the power to borrow money on behalf of the bank, and may bind the bank by a promissory note executed therefor (Paragraph 160 *supra.*) Besides his inherent powers "he may be authorized to act for the bank, by the organic law, by action of the stockholders, by a vote of the board or their verbal order, by usage and tacit approval and by necessity or emergency calling for action manifestly to the interest of the bank." (Paragraph 165 *supra.*)

It is also said that "if the directors have for many years allowed the Cashier to do without interference, all the business of the bank, they are held thereby to have conferred upon him authority to do anything and everything on the corporate behalf which the charter or law does not absolutely prohibit and forbid a cashier to do, and so render illegal under all circumstances. If the Cashier has a power so wide and liberal as this it is needless to prove a usage to do any particular act which he may have undertaken. If the act does not fall within the limits of unavoidable and inherent. illegality it is valid and binds the bank, though a precisely similar act may never before have been undertaken by the Cashier since the creation of the institution." (Paragraph 165 *supra.*) It is evident from the testimony in the instant case that the Directors of the Pensacola Bank gave to Scudamore a very wide latitude in managing the affairs of the bank. He seems to have had complete control of its business relations with other banks, and of its mail. No one else seems to have taken any interest in these matters. The book-keeping also seems to have been en-

tirely under his control. If he used the latitude thus given him to the prejudice of the bank, it seems to us it would be most unjust to make the St. Petersburg Bank pay for the negligence of the Directors of the Pensacola Bank.

Upon a consideration of the whole evidence in the light of the principles of law applicable thereto, a verdict for the plaintiff could not lawfully have been rendered, therefore the court did not err in directing a verdict for the defendant. See Wade v. Louisville & N. R. Co., 54 Fla. 277, 45 South. Rep. 472; Bass v. Ramos, 58 Fla. 161, 50 South. Rep. 945.

The judgment is affirmed.

TAYLOR and PARKHILL, J. J., concur.

WHITFIELD, C. J., and SHACKLEFORD and COCKRELL, J. J., concur in the opinion.

Petition for rehearing in this case denied.