## GIBBONS v. ANDERSON et al.

(Circuit Court, W. D. Michigan. April 21, 1897.)

1. NATIONAL BANKS — DUTY AND LIABILITY OF DIRECTORS — MALFEASANCE OF OFFICERS.

The duty of the board of directors is not discharged by merely selecting officers of good reputation for ability and integrity, and then leaving the affairs of the bank in their hands, without any other supervision or examination than mere inquiry of such officers, and relying upon their statements until some cause for suspicion attracts their attention. The board is bound to maintain a supervision of the bank's affairs, to have a general knowledge of the character of the business and the manner in which it is conducted, and to know at least on what security its large lines of credit are given.

2. SAME—INSOLVENCY—SUIT BY RECEIVER AGAINST DIRECTORS.

A receiver of a national bank may sue the directors to hold them responsible for the malfeasance of the managing officer, when it appears that they were so negligent as to make practically no examination of its books or affairs, and to hold meetings only at rare intervals, and then to limit their business almost wholly to the election of directors and the declaration of dividends. In such case their liability for losses should begin at a time when they ceased to discharge the duty of giving proper supervision to the conduct of the bank's affairs. In the circumstances of the present case, they were held liable from the time when, by reason of the failure to earn dividends for more than a year, their attention should have been drawn to the necessity of making a thorough examination.

Hearing on Pleadings and Proofs.

Fletcher & Wanty (A. C. Denison, of counsel), for complainant.

Fitz Gerald & Barry (J. W. Champlin and N. O. Griswold, of counsel), for defendants.

SEVERENS, District Judge. The bill in this case was filed by the complainant, as receiver of the City National Bank of Greenville, to establish the liability of the defendants, Foster and Anderson, who were directors of the bank, for negligence in the performance of their duties as such, which it is alleged has resulted in a heavy loss to the bank and its creditors. The bank was organized April 28, 1884, with a capital stock of $50,000. It suspended on the 22d day of June, 1893. The complainant was appointed receiver thereof by the comptroller of the currency five days later, and on July 1, 1893, entered upon the discharge of his duties. The total liability of the bank to its creditors at the time of its failure was $237,733. The nominal value of its assets was about $326,000, but the total net amount which the receiver has been able to realize from the assets is only about $40,000. This result is certainly a very startling one, and the enormous loss in the liquida-

tion of the bank's assets calls for an inquiry for its causes. And they are not far to seek. The defendants were members of the board of directors from its organization to the date of its suspension. Le Roy Moore was another director, and, either in the capacity of cashier or president, was its managing officer during the whole of the bank's operations. If during part of the time another person was cashier, he was only nominally such. Moore dominated the bank, and exercised the functions of cashier. Upon investigation it turns out that substantially from the beginning Moore employed the bank for the promotion of his own business enterprises, and, to a steadily increasing amount, has in one way and another diverted its funds to his own use, to the extent that at the date of the suspension of the bank he was indebted to the bank upon paper of which he was the maker in the sum of $36,263.63, and as indorser in his own name in the sum of $44,819.59. He was also liable as indorser under the name of Le Roy Moore & Co. in the sum of $17,419.97. No other person than Le Roy Moore was liable for these indorsements of Le Roy Moore & Co.; the other member having long since been discharged by the renewal of paper and the extension of credit without his knowledge,—that firm having been dissolved in 1887, and the liabilities thereof assumed by Moore. There was also in the bank at the time of its suspension, representing part of its assets, paper upon which the Stanwood Manufacturing Company was maker to the amount of $8,750, and upon which it was indorser, $67,748.54, amounting in all to $76,498.54. This Stanwood Manufacturing Company was a business concern of which Moore was the owner, with a trifling exception. He owned 2,400 of the 2,500 shares of $10 each, and, so far as appears, only 20 other shares were taken The books of the company show that $15,000 only of its capital stock were paid in, and this by Le Roy Moore's individual promissory notes, upon which he never made any payment. The bank had a chattel mortgage on all its property, and the sum of $3,500 was the sum realized out of the sale of that property under this mortgage. Over $63,000 of paper held by the bank, upon which the Stanwood Manufacturing Company was indorser, consisted of accommodation notes made by the employés about the factory of the Stanwood Manufacturing Company, and was worthless. This paper was all unloaded upon the bank by Moore in the prosecution of his own enterprises, and operated practically as a credit to himself. For a number of years prior to the suspension of the bank he was a borrower from it, either upon his own name, or under a guise so thin as to be transparent, to an amount grossly in excess of the legal limit. The comptroller in his letter of October 14, 1892, states that at the last examination he was directly indebted to the bank in the sum of $29,565. In all these ways, direct and indirect, Moore converted the assets of the bank to his own use, and in the end it appears that for all these large sums which Moore had obtained, and which were represented by paper which he had employed for that purpose, amounting to $172,768.88, only a very little can be realized. Moore made a trust deed of all his property to secure the debts he owed to the

bank, out of which not more than $12,000 to $15,000 can be realized. This is the result, not of a single fraud, nor of a group of contemporaneous frauds, practiced by Moore, but, as already stated, it is the consequence of malversation of the funds of the bank from about the beginning of its history. It is needless to go into detail. The books of the bank show that he was going deeper and deeper into the funds of the bank, and, under one cover or another, converted of its assets more than three times the amount of its capital stock. The defendants, who were directors all this time, say that they were ignorant of anything wrong in the affairs of the bank until their eyes were opened to the facts by its failure. Greenville is a small place, of only about 3,000 inhabitants, and the defendants resided there. The volume of the business of the bank was comparatively small,—certainly not so large but that the most cursory examination of the general features of its business by any one having ordinary business intelligence would have disclosed the truth. It is contended by the directors that they did not in fact know how Moore was carrying the substance out of it, and it is the more charitable view to take of their conduct to the extent that supine negligence is more easily excused than active fraud. There is in the record the testimony of witnesses stating that at the time of the failure of the bank these defendants declared that they trusted all to the president, and that they knew but little of the bank's affairs, relying as they did upon their confidence in the management. But what else can be said than that, if they had notice of the facts, they were culpable, or that, if they did not know them, they were grossly negligent and inattentive to their duties? The testimony convinces me that the latter is the fact, and that their negligence and lack of interest was so profound that not even the disclosures and the warning contained in the letter of the comptroller of October 14, 1892, and which, pursuant to his request, was brought to their attention, aroused them from the stupor which beset them; for the situation was in no wise redeemed, and grew steadily worse without the moving of a hand by the directors to save it. From the time of their election the board of directors seems to have slumbered over the affairs of the bank while its managing officer was plundering it of all that it owned, and much that belonged to others. Once in a while there seems to have been some faint consciousness, but nothing which indicates any activity. But they say, and have called witnesses to prove, that acting in accord with the usage and custom of national banks, and having called into the management a person in whom they had entire confidence, which was justified by his reputation, and committed the affairs of the bank to him, they were not bound to have doubt and distrust of his correct dealing until something occurred which should arouse suspicion. And this is their defense. The learned counsel for the defendants puts the question thus:

"Whether a director in a national bank is individually liable for loss to the bank accruing through another director, viz. its president, when such mismanagement was not known to or participated in by the directors sought to be charged."

Or, in another form:

"Whether an individual director in a national bank is liable in his individual capacity for all losses occasioned by the mismanagement of the bank's affairs by a trusted officer through the neglect of the board of directors to meet and examine into the affairs of the bank."

These questions present in the most favorable light for the defendants what is undoubtedly the substance of the inquiry upon the facts which existed in this case, and which is, in short, this: Whether the duty of the board of directors is discharged by the selection of officers of good reputation for ability and integrity, and then leaving the affairs of the bank without any other supervision or examination than mere inquiry of the officer, and relying upon his statements until some cause for suspicion attracts their attention. Section 9 of the national banking act, being section 5147 of the Revised Statutes, provides that:

"Each director, when appointed or elected, shall take an oath that he will, so far as the duty devolves on him, diligently and honestly administer the affairs of such association."

And by section 5145 it is declared that the affairs of such association shall be managed by not less than five directors. The oath which the director is required to take, that he will diligently and honestly administer the affairs of such association, indicates the scope of his obligation. The management of the bank is cast upon the board of directors. The duty of managing and administering the affairs of the bank by the board of directors has been differently construed in decisions bearing upon this subject, but it is not necessary for me to analyze the cases, or to reconcile their apparent differences. Some of them have gone to a length which in my opinion is extremely dangerous to the public safety, and, if generally applied, would make these banking associations, which were designed to supply the people of the country with financial institutions hedged about with security on which their confidence might securely rest, the objects of doubt and distrust. The rule of decision by which my judgment in the present case must be guided is laid down in the case of Briggs v. Spaulding, 141 U. S. 132, 11 Sup. Ct. 924. Much of the discussion in that case was devoted to the consideration of the special circumstances upon which rested the charges made against the several directors. Those circumstances have little or no resemblance to those of the present case, and not much aid is afforded by that part of the discussion; for, as the court in that case observed, each case must stand upon its own facts. The directors in that case were held to be excusable. One very important and noticeable difference between that case and this is in the fact that the question there was narrowed down to one of fact, as to whether the defendants were fairly liable for not preventing loss by putting the bank into liquidation within 90 days after they became directors, the previous condition of the bank being admitted to have been good, whereas in the present case the defendants' neglect runs through quite a number of years. But the court laid down certain general rules by which the obligation of directors of national banks is to be tested; that

is to say, they declare what is the minimum of that obligation. Chief Justice Fuller, delivering the opinion of the court, said:

"We hold that directors must exercise ordinary care and prudence in the administration of the affairs of a bank, and that this includes something more than officiating as figureheads. They are entitled, under the law, to commit the banking business, as defined, to their duly-authorized officers, but this does not absolve them from the duty of reasonable supervision; nor ought they to be permitted to be shielded from liability because of want of knowledge of wrongdoing, if that ignorance is the result of gross inattention."

In my opinion, it does not meet the requirements of this statement of the law that directors may confide the management of the operations of the bank to a trusted officer, and then repose upon their confidence in his right conduct, without making examinations themselves, or relying upon his answers to general questions put to him with regard to the status of the affairs of the bank. To begin with, it is to be assumed in every case that the directors have not selected any other than a man of good reputation for capacity and integrity. Any other idea assumes that they have been guilty at the outset of a glaring fault. Further, it is a well-known fact that a large proportion of the disasters which befall banking institutions come from the malfeasance of just such men, and it would be manifest to everybody that only a satisfactory and quieting reply would be made by the official who has any reason for concealment. Again, what are the duties of management that are committed to the cashier, or the officer standing in his place? They are those which relate to the details of the business, to the conduct of particular transactions. Even in respect of those, his duties are conjoint with those of the board of directors. In large affairs it is his duty to confer with the board. In questions of doubt and difficulty, and where there is time for consultation, it is his duty to seek their advice and direction. It is his duty to look after the details of the office business, and generally to conduct its ordinary operations. It is the right and duty of the board to maintain a supervision of the affairs of the bank; to have a general knowledge of the manner in which its business is conducted, and of the character of that business; and to have at least such a degree of intimacy with its affairs as to know to whom, and upon what security, its large lines of credit are given; and generally to know of, and give direction with regard to, the important and general affairs of the bank, of which the cashier executes the details. They are not expected to watch the routine of every day's business, or observe the particular state of the accounts, unless there is special reason; nor are they to be held responsible for any sudden and unforeseen dereliction of executive officers, or other accidents which there was no reason to apprehend. The duties of the board and of the cashier are correlative. One side are those of an executive nature, which relate mainly to the details. On the other are those of an administrative character, which relate to direction and supervision; and supervision is as necessarily incumbent upon the board as direction, unless the affairs of banks are to be left entirely to the trustworthiness of cashiers. Doubtless there are many matters which stand on middle ground, and where it may be

difficult to fix the responsibility, but I think there is no such difficulty here. The idea which seems to prevail in some quarters, that a director is chosen because he is a man of good standing and character, and on that account will give reputation to the bank, and that his only office is to delegate to some other person the management of its affairs, and rest on that until his suspicion is aroused, which generally does not happen until the mischief is done, cannot be accepted as sound. It is sometimes suggested, in effect, that, if larger responsibilities are devolved upon directors, few men would be willing to risk their character and means by taking such an office; but congress had some substantial purpose when, in addition to the provision for executive officers, it further provided for a board of directors to manage the bank and administer its affairs. The stockholders might elect a cashier, and a president as well. The banks themselves are prone to state, and hold out to the public, who compose their boards of directors. The idea is not to be tolerated that they serve as merely gilded ornaments of the institution, to enhance its attractiveness, or that their reputations should be used as a lure to customers. What the public suppose, and have the right to suppose, is that those men have been selected by reason of their high character for integrity, their sound judgment, and their capacity for conducting the affairs of the bank safely and securely. The public act on this presumption, and trust their property with the bank in the confidence that the directors will discharge a substantial duty. How long would any national bank have the confidence of depositors or other creditors if it were given out that these directors whose names so often stand at the head of its business cards and advertisements, and who are always used as makeweights in its solicitations for business, would only select a cashier, and surrender the management to him? It is safe to say such an institution would be shunned and could not endure. It is inconsistent with the purpose and policy of the banking act that its vital interests should be committed to one man, without oversight and control.

Recurring to the present case, it is clear that unless the board of directors is to be absolved upon the theory that they were justified in committing the affairs of the bank to Moore, and relying upon his good conduct, and his answers to the perfunctory questions which were occasionally put to him, until they were brought to the facts by the collapse of the bank upon the first prick of a financial stringency such as came upon the country in the summer of 1893, they must be held liable. It is with sincere commiseration and regret that the court feels compelled to reach this conclusion, in view of the consequence which must follow to these directors. But there is another side to this matter. The court cannot ignore the rights and interests of the depositors and others who have trustfully confided their money to the bank, and who now find that it was run through a shell into the hands of Moore, while the defendants turned their heads away, and failed to give them the protection which a proper discharge of their duties would have afforded. The records of the board of directors make a sorry showing, when

put in contrast with the financial history of the bank. The entries are few, at long intervals, and are almost wholly limited to the election of directors and the declaration of dividends. They are feebly supplemented by the oral testimony of the defendants, which tends only to show that individual inquiries were occasionally made by them, of a comparatively superficial character. There was no examination of the books; at least, none of any value. If there had been such examination by a fairly intelligent man, such as a director promises he is, the condition of things would have been seen. It is not irreconcilable with what they declared, when the bank failed, with respect to their knowledge of its affairs, and with what I must believe was substantially the truth of the matter. It may be conceded that the members of the board were not responsible for the malfeasance or nonfeasance of their associates, where the fault of the others was not known to them, and they were helpless to prevent the consequences; but in the present case the charge of negligence rests upon the whole board, and there is nothing to show that the defendants took any steps to retrieve the consequences of the joint negligence. If the defendants had been able to show that they themselves had done what they could to induce the board to attend to its duty, a different case would be presented. I do not understand why the comptroller did not more energetically interfere, but I have no duty to criticise his action.

The next question for determination is in respect of the date from which the defendants should be charged. It appears from the record of the board of directors that on January 2, 1886, a dividend of 10 per cent. was declared; on January 11, 1887, a dividend of 9 per cent.; on July 15, 1887, a dividend of 7 per cent.; January 10, 1888, a dividend of 5 per cent.; July 9, 1888, a dividend of 5 per cent.; January 8, 1889, a dividend of $5\frac{1}{2}$ per cent.; January 14, 1890, a dividend of 8 per cent.; December 30, 1890, a dividend of 8 per cent.; and July 1, 1891, a dividend of 7 per cent. No dividend was declared in January, 1892, or in July of that year. It would seem to me that at the last-mentioned date the fact that a year had now gone by without any declaration of dividend, and no sufficient explanation thereof being shown, the attention of the board of directors to the bank's condition was challenged, and that, in the interest of those concerned, an examination into the causes should have been instituted. The test of the prudence and attention which an ordinarily discreet business man would give to his own affairs may properly be applied here. But no examination was made, and, indeed, so far as the records show, there never was but a single examination made by the board of directors, or any committee thereof; and that was on September 1, 1886,—more than six years before the failure of the bank. With serious misgiving that the right of the case would require the court to go further back than this, I have concluded to adopt the date of July 1, 1892, as the period from which the defendants must be held liable. Such examination as they should then have made would have been followed by putting the bank in liquidation, and I think the defendants should be held liable for the losses which the bank subsequently

sustained. An order of reference will be made for the ascertainment of the amount of such losses. Let a decree be entered in conformity with this opinion.