[Civil No. 2697. Filed July 16, 1928.]

[269 Pac. 68.]

CONSOLIDATED NATIONAL BANK OF TUCSON, a Corporation, Appellant, v. THE ANGLO & LONDON PARIS NATIONAL BANK OF SAN FRANCISCO, a Corporation, Appellee.

Mr. Frank H. Hereford, Mr. E. T. Cusick, and Messrs. Kingan & Darnell, for Appellant.

Messrs. Armstrong, Lewis & Kramer, for Appellee.

LOCKWOOD, J.—Anglo & London Paris National Bank of San Francisco, a corporation, hereinafter called plaintiff, brought suit against Consolidated National Bank of Tucson, a corporation, hereinafter called defendant, on two causes of action. The first was on a guaranty of certain promissory notes

amounting to the sum of $67,649.68, and the second for an alleged loan by plaintiff to defendant in the same amount. Defendant set up a voluminous answer, the substance of which was that, as to the guaranty in the first cause of action, it was *ultra vires* and void, and, as to the alleged loan in the second cause of action, that no such loan was ever made. The case was heard before the court sitting with a jury, and the following special interrogatory was submitted to the jury, no general verdict being rendered:

"Did plaintiff lend to the defendant, on or about the year 1921 or 1922, at the special instance and request of the defendant, the sum of $67,649.68, upon which have been made certain payments mentioned in the evidence?"

To this interrogatory the jury answered. "Yes"; and the trial court rendered judgment in favor of plaintiff for the amount set forth in the interrogatory, with interest and costs. After the usual motion for new trial was made and overruled, defendant appealed to this court.

The evidence in the case shows very little conflict. It is mostly of a documentary nature, the exception being one or two conversations between certain officers of plaintiff and defendant. The material facts of the case are therefore not in doubt, the only serious question being as to their legal effect, and we state them as follows:

Both plaintiff and defendant are national banks, engaged in business for many years, the former in San Francisco, and the latter in Tucson. During nearly all of this period plaintiff has been the San Francisco correspondent of defendant, and the latter has maintained with the former large balances, generally amounting to several hundred thousand dollars. Throughout the transactions leading up to this case, Albert Steinfeld was president and principal stockholder of defendant, and was also a stockholder in

plaintiff. Charles E. Walker was during most of that time vice-president and active manager of defendant, and also a stockholder therein. Early in the year 1920, Tucson Cattle Loan Company, a corporation, hereinafter called the company, was organized for the purpose of lending money to individuals and companies engaged in the cattle business. Steinfeld and Walker were, respectively, president and vice-president of the company; the latter being its actual manager, and its offices were in the Consolidated National Bank. The company itself had comparatively little resources, and expected to make its profits on money borrowed from different banks and other institutions and reloaned to various individuals and companies as above; some of these companies being owned in substance by Walker and other stockholders of the company. It was apparently the idea of the company and its officers and stockholders to use the connection of Walker and Steinfeld with defendant for the purpose of securing money and credit from defendant and from other institutions with whom it had dealings and credit.

Some time during the year 1921 Walker was in San Francisco, and had a conversation with Harry Coe, the vice-president of plaintiff, stating that defendant had certain paper that it was inconvenient for it to carry, and he wanted to know if plaintiff would help them. Later in the same year Steinfeld visited plaintiff bank, and, referring to the previous conversation with Walker, told Coe that the defendant wanted plaintiff to carry certain paper,—as Coe testified:

"He said the paper would be all right, and he would see us through, and it would be all right for us to charge it back at maturity."

Coe then said, explaining the transaction, "That would be tantamount to a guaranty of insurance";

and, accounting for defendant's not indorsing the paper, testified:

"Q. Why didn't you take a written agreement from the Consolidated that it would pay these notes, or why didn't you have these notes indorsed by the Consolidated National Bank? A. The Consolidated National Bank didn't want to indorse them. They would have to show their liability on their own books. That was understood. They wanted us to relieve them.

"The Court: Q. Without letting the bank examiner know it. That is about the size of it? A. Yes, sir.

"Mr. Darnell: Q. Without letting the bank examiner know. Did you do that often with other banks? A. We have done it for clients; yes.

"Q. Did you know that was the purpose? A. Well, I didn't ask him particularly what the purpose was. I understood from Mr. Walker that it would be a matter of convenience for him to dispose of certain paper.

"The Court: Q. Well, the long and short of it is that the Consolidated Bank didn't want the bank examiner to know they had this contingent liability, and your bank knew it, and you helped them out. That is about the size of it. Now, frankly, isn't that the size of it? That is what you did? A. Yes; that is exactly what we did. It is not an unusual thing for a larger bank to help one of its correspondents keeping a deposit account—very ordinary thing."

Shortly thereafter Walker wrote on the letter-head of defendant to Coe as follows:

"I am inclosing herewith note of A. W. Wilson & Company to Tucson Cattle Loan Company, dated April the 29th, maturing October 29th, original $20,000, on which a payment of $5,000 has been indorsed, which we would very much appreciate your handling for our Tucson Cattle Loan Company in connection with the credit arranged by Mr. Steinfeld when he was in the bank early in August."

Plaintiff replied to defendant as follows:

"We have to-day credited your account $14,878.12, covering note of the Tucson Cattle Loan Company forwarded in your favor of September 14th."

From that time on until 1922 various notes, either executed directly by Tucson Cattle Loan Company in favor of plaintiff, or by other parties to Tucson Cattle Loan Company, and by it indorsed to plaintiff, were forwarded by Walker to plaintiff. In so doing, Walker sometimes used letter-heads of the company, and sometimes of defendant, signing as vice-president, in most cases without specifying whether acting for the company or for defendant. In all cases plaintiff would credit the amount of the note sent it to the account of defendant maintained with it, and defendant, on receiving notice to that effect, would credit the account of the company which was kept with defendant.

In July, 1922, the company made application for a renewal of certain notes, then held by plaintiff, and was informed by the latter as follows:

"We wired you this morning that we would be pleased to accommodate you by carrying rediscounts to the extent of $30,000.00, providing the Consolidated National Bank of your city would authorize us to charge their account with this paper on the due date."

Defendant immediately wrote plaintiff as follows:

"It is satisfactory to have maturing paper charged to account of the bank, and we will use our best endeavors to arrange payment at maturity, but the bank cannot guarantee payment at maturity."

From this time on there were various transactions of the same general nature as those previously referred to. There was nothing upon any of the notes, or the collateral paper connected with them, to show that defendant was in any way liable upon them. They were always shown upon the books of plaintiff as part of its assets, and not as collateral security for a loan by it to defendant. Plaintiff's books were examined by national bank examiners repeatedly

while these notes were in its possession, and nothing upon the books showed any liability on the part of defendant on the notes. On their face, they showed plaintiff had made a loan to, or a discount for, the company, and not to or for defendant.

In 1924, it appearing that the company was unable to make payment of the interest due on the various notes, plaintiff sent a representative to Tucson to investigate the situation. Walker was no longer with defendant. Steinfeld, his son, and P. M. Clark, all of whom were officers and directors of defendant, recognized the moral responsibility of the latter for the loans, but there is a dispute in the testimony as to whether they admitted any legal liability. Be that as it may, upon the return of plaintiff's representative to San Francisco, plaintiff charged to defendant's account with it the amount then due on all the notes included in this controversy, together with some others not involved in the case. At this time Steinfeld was indebted to plaintiff on a personal note then due for $125,000, and was about to sever his connection with defendant, though the deal had not been fully consummated. Steinfeld and Clark went to San Francisco to discuss the matter with plaintiff's officers. In such negotiations the latter made it clear the loans were made as an accommodation to Steinfeld, and were based upon his moral responsibility therefor, whatever the legal form of the transactions. As a result of the negotiations, defendant executed the following guaranty, addressed to plaintiff:

"On November 22d, 1924, you charged to our account the following notes: (Listing notes) which notes are the direct and indirect obligations of the Tucson Cattle Loan Company, and were taken by you for the account and accommodation of the Consolidated National Bank of Tucson, Arizona.

"We fully recognize our obligation in connection with the placing of these notes with you. . . .

"In consideration of your reversing the charge to our account under date of Nov. 22d, 1924, and reinstating the remaining notes above or renewals thereof referred to, aggregating a total of $67,649.68 (listing notes), . . . and in further consideration of your carrying these notes aggregating $67,649.68 for a period of 12 months from this date, we hereby guarantee and agree to protect you against any loss that may arise in connection with these notes, aggregating $67,649.68, or, in the event that liquidation is not effected within 12 months from this date, we agree to see that your bank is relieved of further financing of these items if it is your desire to obtain liquidation at the end of twelve months' period."

Plaintiff, at the end of twelve months, requested defendant to liquidate the notes, but the latter, having passed under a different management, refused to do so, and denied any liability on the guaranty or the notes, whereupon this suit was brought.

The situation presented by the foregoing facts is indeed a most deplorable one, and illustrates again what has so often appeared in the history of our country and state, that the use of the funds of the depositors of public banking institutions by the officers of such institutions for their own private purposes and gain, despite the attempt on the part of courts and legislatures to prevent such practices, almost invariably results in the innocent depositors and stockholders paying the losses of such transactions, if there be losses, while, if on the contrary profits are made, they go into the pockets of those who are presumably trustees for the benefit of others. That such transactions are usually attempted to be made in colorable legal form so as to avoid breaking the letter of the law, while violating its spirit, in no manner minimizes the moral iniquity of such conduct. The evidence in this case shows conclusively that Steinfeld and Walker, who had the entire control and management of defendant in their hands, organized a

subsidiary company for their own benefit and that of some of their friends and associates, and used the funds and credit of defendant for the purpose of making a profit for themselves. It further shows that, finding themselves in a position where they could no longer legally borrow money from defendant for these purposes, they secured, nearly $100,000, from plaintiff, and that this was done in either one of two ways: As stated in the first cause of action, by securing a guaranty from defendant of an indebtedness in which it had, and could have, no interest, and without any consideration therefor passing to it; or else by a loan to defendant itself, made in the manner above described, for the express purpose of deceiving the national bank examiners as to the true situation and as to the respective assets and liabilities of both plaintiff and defendant. Was the transaction a guaranty as set up in the first cause of action, or was it a loan, as maintained in the second, and what are the legal consequences of either hypothesis?

It is unquestionably the law that a national bank, in negotiating its own paper, may bind itself for the payment thereof by its indorsement, but it cannot guarantee payment of the paper of others or become surety thereon for such others' benefit, and any such guaranty is *ultra vires* and void, and no recovery may be had thereon. *Johnson* v. *Charlottesville Nat. Bank,* Fed. Cas. No. 7425; *Flannagan* v. *California Nat. Bank,* (C. C.) 56 Fed. 959, 23 L. R. A. 836; *Bowen* v. *Needles Nat. Bank,* (C. C. A.) 94 Fed. 925; *Commercial Nat. Bank* v. *Pirie,* (C. C. A.) 82 Fed. 799; *Merchants' Bank* v. *Baird,* (C. C. A.) 160 Fed. 642, 17 L. R. A. (N. S.) 526. If the transactions between plaintiff and defendant up to the written agreement of December 4, 1924, above quoted, are to be construed as constituting a guaranty of the paper of a third party, it is obvious that defendant's action in giving such guaranty was *ultra vires* and void, and

no action can be maintained on it as such. Nor is the written agreement of any greater force and effect. The consideration expressed therein is the charging back to defendant on plaintiff's books of the sum previously charged out. If, as we have stated, the original guaranty was void, plaintiff had no right to charge out the amount which it did, and its returning the sum unlawfully taken is no consideration for the subsequent written guaranty. The return by the thief of money taken at the point of a pistol is no consideration for any promise on the part of the injured person.

There is, however, an apparent, though not a real, exception to this rule as to the effect of *ultra vires* acts. If a corporation makes a contract of this nature, and receives a benefit from the contract, a liability does exist. Such liability, however, is not upon the *ultra vires* contract, but upon the implied contract to pay for what the corporation receives. *Central Transportation Co.* v. *Pullman, etc.,* 139 U. S. 24, 35 L. Ed. 55, 11 Sup. Ct. Rep. 478. And its liability is limited to the benefits which it actually did receive from the transaction. *Western Nat. Bank* v. *Armstrong,* 152 U. S. 346, 38 L. Ed. 470, 14 Sup. Ct. Rep. 572; *Aldrich* v. *Chem. Nat. Bank,* 176 U. S. 618, 44 L. Ed. 611, 20 Sup. Ct. Rep. 498. The two cases last cited show clearly the rule and its limitations. In the former it appeared that an officer of defendant borrowed money ostensibly for his bank, that the money was placed to the credit of the borrowing bank on the books of the lending bank, and was afterwards withdrawn by his direction in the name of the borrowing bank, but that the defendant bank never received any actual benefit from the loan. The court said:

"The money advanced by the New York bank was, indeed, at Harper's request, placed to the credit of the Ohio bank, but it was shown that it was withdrawn partly by Hopkins, the assistant cashier, and

partly by Harper himself, by the drafts in the name of the bank, but that the moneys thus drawn never came into the actual possession or use of the bank. The moneys were appropriated by Harper to his own use, or, at all events, it does not appear that the bank ever got a penny of the borrowed money or any benefit or advantage whatever by reason of the transaction. The mere placing of the money in the name of the Ohio bank involved no ratification by the bank unless it was so placed with their knowledge and assent, nor did the withdrawal of the money by drafts drawn by Harper or by his direction in the name of the bank constitute a receipt by the bank of such money, *unless it was, in point of fact, received and used by the bank or for its benefit.*" (Italics ours.)

The same question arose in the later case, but therein it appeared that the bank actually did get and use the money for its own benefit, and the court held, distinguishing the Armstrong case, *supra,* that the borrowing bank was liable, saying:

"As the Fidelity Bank used the money so obtained in its banking business and for its own benefit, the latter bank *having enjoyed the fruits of the transaction* cannot avoid accountability to the New York Bank. . . . " (Italics ours.)

The only theory, then, upon which plaintiff can successfully maintain its first cause of action is that defendant did actually receive a benefit from the transactions, and the former can only recover *to the amount of the benefit received. Citizens' Central Nat. Bank* v. *Appleton,* 216 U. S. 196, 54 L. Ed. 443, 30 Sup. Ct. Rep. 364; *Rankin* v. *Emigh,* 218 U. S. 27, 54 L. Ed. 915, 30 Sup. Ct. Rep. 672. It appeared that, when any amount was credited to defendant's account with plaintiff as proceeds of any of the notes involved, such amount was immediately by defendant credited to the company's account with it. By such a transaction defendant certainly received no benefit. If, as a matter of fact, a direct pecuniary benefit was received by defendant as a result of the transactions,

up to the charging out of the amount of the notes in November, 1924, it is of course liable therefor on the implied contract, but plaintiff must show such benefits by direct evidence, and its recovery will be limited *to the amount of the benefit so received.* There is no evidence in the record showing that defendant received benefits to anything like the amount of the judgment rendered, if at all. As we have stated before, the charging back of the amount previously illegally charged off can in no manner be considered a benefit in the sense that it would make defendant liable as for money received in that amount. *Worthen* v. *Thompson,* 54 Ark. 151, 15 S. W. 192; *Killough* v. *Payne,* 52 Ark. 174, 12 S. W. 327. The judgment cannot be sustained on the theory of a guaranty of indebtedness or an implied promise to pay money received as a result of such guaranty.

When we consider the second cause of action, we are confronted with this situation: Plaintiff claims that it made a loan to defendant, that, because such loan was made for a purpose which under the National Banking Act would have been illegal, viz., for a reloan by defendant to the company of an amount in excess of that authorized by law, the whole transaction was conducted in the manner in which it was for the express purpose of deceiving the national bank examiners, and that, in pursuance of said conspiracy, both plaintiff and defendant for a number of years made false returns to the bank examiners as to the actual liabilities and assets of their respective institutions. We think, if plaintiff's contention that this is the true situation is correct, it falls exactly within the dissenting opinion of Judge CALDWELL in the case of *Hanover Nat. Bank* v. *First Nat. Bank,* (C. C. A.) 109 Fed. 421. Because the facts in that case are so similar to those in the one at bar, we quote therefrom as follows:

"To carry out Sheldon's idea, it was necessary for the plaintiff bank to become an active participant in the scheme to evade and violate the statute. The basis of the whole agreement now set up was the fraudulent concealment of a fact the law required to be reported to the Comptroller of the Currency, and published for the protection of the public. It was to be done so artfully that no bank examiner could ever discover the fraud. To accomplish this, it was absolutely essential that the plaintiff bank should assert, as it did, and make its books show, as it did, that the note was discounted for the account of Sheldon personally, and that there was no liability on the bank for the same. All this the plaintiff bank agreed to do and did do. A more shocking agreement was probably never entered into by a reputable financial institution. It involved a violation of the act of Congress by the officers of both banks—on the part of the plaintiff bank a false statement, in this: That it would report the sum of the note as due from Sheldon instead of the defendant bank; and on the part of the defendant bank a false statement of its liabilities. If Sheldon's note was then a liability of the defendant bank as now claimed, then this agreement necessarily contemplated the commission of fraud and perjury, which the statute denounces and punishes as a crime. In view of this obvious fact, it is not surprising that, when Sheldon unfolded to the plaintiff bank this shocking scheme which he had devised to cheat the law and defraud the public, the plaintiff's cashier says, 'We demurred a little at that'; but they did not stand on their demurrer, and their virtuous instincts soon gave way under the urgent plea of Sheldon, and he says, 'We agreed to do it in that way.' Here we have a distinct agreement amounting in law to a deliberate conspiracy between Sheldon and the plaintiff bank to violate the statute and defraud the public if the note was then a liability of the bank. In the face of these facts it is vain to talk about the plaintiff bank being an innocent party. It is said these facts constitute no defense to this action, because the penalties for the violation of the statute, 'are prescribed by that act, and an avoidance of the unreported legal liabilities of the bank is not among them.' No one contends that, when a bank fails to report its debts,

it is thereby discharged from them. But if one national bank, for the purpose of enabling another national bank to evade the provisions of the statute requiring it to make a true report to the Comptroller of the Currency of its liabilities, agrees to discount and does discount the individual note of the president of the latter bank without the indorsement or guaranty of the latter bank, the former bank will not thereafter be heard to set up a claim that the note is the obligation of the bank, and not the personal obligation of its maker, as it purports to be.''

It is true that in the case cited the majority of the court held the contract to be valid, notwithstanding the conspiracy to deceive the bank examiners, on the ground that such conspiracy was not part either of the consideration or the promise, and the majority rule has been followed since by the federal courts in cases involving violations of the National Banking Act (13 Stat. 99). We think, however, that the reasoning of Judge CALDWELL is far superior to that of the majority opinion, and more in consonance with general public policy. The laws in regard to banks were passed for the protection of the public. It is, alas, but too common that the officers and directors of such institutions, instead of looking upon their positions as sacred trusts for the benefit of their depositors and stockholders, consider them as an opportunity for private and illicit, if not illegal, profit. Such conduct should not be countenanced by the courts, and, so far as contracts governed by the law of Arizona are concerned, we hold that a contract which necessarily involves a violation of banking law is *ipso facto* illegal and void as against public policy.

It may be urged that the alleged loan involves the construction of a federal statute, and we are therefore bound by the decisions of the federal courts as to its validity. We need not decide that question in the present case, for there is no evidence which would

justify the conclusion that the transactions were loans from plaintiff to defendant.

The situation, so far as plaintiff was concerned, is well summed up by the testimony of Clark in regard to a statement made by Fleishhaker, plaintiff's president, when he told Steinfeld "that he was looking to him, not the bank, to protect them":

"I have known you and done business with you for a good many years, and we know Albert Steinfeld, and don't know the rest of them."

The evidence shows conclusively that Steinfeld, for the personal benefit of himself and friends, secured funds from plaintiff, and that the latter made the loans, not to defendant, but to the Tucson Cattle Loan Company, for the accommodation of Steinfeld, knowing he was pledging the funds and credit of defendant to guarantee loans from which it was receiving no benefit. That there is a moral obligation resting on someone to repay plaintiff for the money it loaned is unquestioned. Such obligation, however, rests on those who, to plaintiff's knowledge, actually received the money and the accommodation, and not on defendant, which, as the evidence shows, received neither. Whether that moral obligation is legally enforceable we do not now attempt to decide, but neither good conscience nor law requires defendant to pay the notes in question.

The judgment of the superior court of Pima county is reversed, and the cause remanded, for further proceedings in accordance with this opinion.

ROSS, C. J., and McALISTER, J., concur.