[Civil No. 2837. Filed December 16, 1929.]

[283 Pac. 273.]

A. C. McQUEEN, Appellant, v. FIRST NATIONAL BANK OF MESA CITY, ARIZONA, a Corporation, Appellee.

Mr. J. L. B. Alexander, Mr. William G. Christy and Mr. Harold Baxter, for Appellant.

Messrs. Silverthorn & Van Spanckeren, for Appellee.

LOCKWOOD, C. J.—A. C. McQueen, hereinafter called plaintiff, brought suit in the superior court of Maricopa county against the First National Bank of Mesa City, Arizona, a corporation, hereinafter called defendant. The complaint was for the recovery of a certain sum paid by plaintiff as a result of his signing a note in favor of the Merchants' National Bank of Los Angeles, hereinafter called the bank, and contained two counts, the first alleging that plaintiff signed the note to the bank, relying on an express guaranty from defendant's cashier that defendant would indemnify him for any personal loss in the transaction; and the second setting up in substance that plaintiff was an accommodation maker for the benefit of defendant on the note, and seeking recovery on the implied promise which by law accompanies such a situation. Defendant denied any promises to plaintiff to protect him against any liability on the note, and alleged that, if such promises were made, they were *ultra vires,* and that defendant had received no benefit therefrom, and further set up that the sum paid by plaintiff was to settle a note given by one McElrath for a loan made him by defendant in excess of the limit allowed by law for defendant to make, and that plaintiff had participated in making such loan as a director of defendant. It further alleged that plaintiff and his codirectors had purchased, outright, from defendant, the McElrath note, as well as certain other

notes, and from that time were its owners, and that the note to the bank was given by them to secure the funds to purchase such notes, and defendant had no interest in any of the notes or liability thereon, and also pleaded a general denial. Plaintiff replied, setting up the statute of limitations as against the defense of excess loan, to which reply defendant demurred, and the court sustained such demurrer. The trial court, after the evidence was all in, instructed the jury to return a verdict for defendant, and from the order directing the verdict, and the judgment rendered on such verdict, plaintiff has appealed.

There are some five assignments of error, but we think it advisable to discuss the case rather from the standpoint of the general legal propositions involved than to take up each assignment seriatim. The undisputed facts appear from the record to be as follows: Plaintiff was from the sixteenth day of January, 1918, until June, 1923, a director of defendant, and for many years before that had served on the board of directors of its predecessor in interest, the Mesa City Bank. The capital stock of defendant is and always has been one hundred thousand dollars, and its surplus has at no time exceeded forty thousand dollars. In the fall of 1917, or the spring of 1918, one O. C. McElrath became a patron of defendant, and borrowed large sums of money from it, with the result that on January 30th, 1919, the total loans to him greatly exceeded the amount that defendant was permitted by law to make to any one person. Thereafter, and while McElrath was still an excess borrower, defendant loaned him the further sum of ten thousand dollars, and again on October 10th of the same year another ten thousand dollars. These last two loans were duly approved at directors' meetings of defendant, plaintiff being among the directors present thereat.

During all the period mentioned above the Merchants' National Bank of Los Angeles, California, was defendant's correspondent in that city, and had frequently discounted notes for it, both its own and its customers'. Among the notes so discounted were the two of McElrath for the ten thousand dollars each, above mentioned. The bank also held a third note for the same amount, made by McElrath directly to it, which was guaranteed by the directors of defendant individually. On March 1st, 1921, all of McElrath's indebtedness was consolidated into one note in favor of defendant for $32,785.42, which note included the three ten thousand dollar notes above mentioned, and some small balances still due on other loans.

During the years 1921, 1922 and 1923 defendant was heavily indebted to the bank, and had deposited with it various customers' notes as collateral security for the indebtedness, as well as discounting some of these notes directly. Owing to the collapse of cotton prices and general business conditions in the Salt River Valley, defendant was unable to collect many of these notes when they were due, and on at least two different occasions, in order to satisfy the pressing demands of the bank for a liquidation of the indebtedness due it by defendant, or better security therefor, the directors had given it their individual promissory notes for various large sums. On July 21st, 1922, defendant's cashier wrote the bank regarding its indebtedness as follows:

"We are in a position at the present time to reduce this obligation to an even $180,000, and would like to suggest that it might be much better from your standpoint, as well as our own, to accept from us a directors' note for the full $180,000 amount of customers' notes which have been or may be purchased from this bank by our directors. From your standpoint, it would mean that you would have just the one note to

worry about, which, of course, would be always in good shape, with interest paid promptly at maturity, and, when a renewal was necessary, a prompt renewal of the entire obligation. That would be the advantage from your viewpoint. The advantage gained by us in such an arrangement would be that we would be left free to work out the several difficult individual problems of each of the borrowers, without having to sacrifice any of the collateral or the satisfactory relationship that exists at this time by accepting an untimely renewal.''

This proposition was accepted by the bank, and a note for $179,715.42, dated August 1st, 1922, was executed by seven of the defendant's directors, including plaintiff, and delivered to the bank, together with various customers' notes as collateral security therefor, among these last notes being the McElrath note for $32,785.42, above mentioned. The transaction was shown on defendant's books as a sale to the directors of the customers' notes, and the money shown by the books to have been received as the proceeds of such sale was used to cancel the indebtedness of defendant to the bank. Thereafter, on the face of defendant's records, it had no personal interest, either in these various customers' notes as an asset, or in the indebtedness to the bank as a liability, but merely handled the customers' notes for its directors, and used the proceeds, when available, to apply on their note at the bank. Subsequently, McElrath became insolvent, and the bank demanded that the directors pay the amount of his note, which had been deposited as collateral with it, or substitute some other security. When this demand was made upon them plaintiff resigned as director, and refused to pay any part of the note, with the result that the other directors, who had also signed the note to the bank, paid the entire amount of the McElrath note, and brought suit against plaintiff for his *pro rata* share thereof, recovering judgment against him for $5,602.10, not in-

cluding interest and costs. Plaintiff paid the judgment, and then brought this suit to recover from defendant the amount so paid.

We first discuss the note given by plaintiff and his codirectors to the bank. One of three possible situations must have existed regarding it: (a) The directors may have borrowed the money represented by it for themselves, and used it to purchase customers' notes, including the McElrath note, from defendant, taking title to these customers' notes outright in themselves; (b) the directors may have executed it on the express guaranty on the part of defendant that they would not be obliged to pay it, the proceeds of the note going to the benefit of defendant; (c) the directors may have executed it for the accommodation of defendant, with no express promise from the latter in regard to its payment.

Let us consider the legal effect of each one of these three situations. It is unquestioned that, if the situation is as set forth in (a), plaintiff cannot recover. If he, in common with his codirectors, borrowed money directly from the bank and purchased the McElrath note outright with the proceeds, defendant is under no obligation to him of any nature.

What is the rule if the situation is as set forth in (b), to wit, that the directors signed the note for the accommodation of the defendant, with an express guaranty on the part of the latter that it would hold them harmless? It is unquestionably the law that a national bank may negotiate its own paper, and bind itself for the payment thereof by its indorsement, but it cannot guarantee payment of the paper of others or become surety thereon for such others benefit, and any such guaranty is *ultra vires,* and void, and no recovery may be had thereon. *Consolidated Nat. Bank* v. *Anglo & L. P. Nat. Bank,* 34 Ariz. 160, 269 Pac. 68, and cases cited. It is, however, an

apparent, though not a real, exception to the rule that, if a corporation makes an *ultra vires* contract and receives a benefit therefrom, a liability does under certain circumstances exist. Such liability, however, is not based upon the *ultra vires* contract. The real ground of recovery is well stated in *Central Transportation Co.* v. *Pullman's Palace Car Co.*, 139 U. S. 24, 35 L. Ed. 55, 11 Sup. Ct. Rep. 478, 488:

"A contract *ultra vires* being unlawful and void, not because it is in itself immoral, but because the corporation, by the law of its creation, is incapable of making it, the courts, while refusing to maintain any action upon the unlawful contract, have always striven to do justice between the parties, so far as could be done consistently with adherence to law, by permitting property or money, parted with on the faith of the unlawful contract, to be recovered back, or compensation to be made for it. In such case, however, the action is not maintained upon the unlawful contract, nor according to its terms; *but on an implied contract of the defendant to return, or, failing to do that, to make compensation for, property or money which it has no right to retain.* To maintain such an action is not to affirm, but to disaffirm, the unlawful contract.

"The ground and the limits of the rule concerning the remedy, in the case of a contract *ultra vires,* which has been partly performed, and under which property has passed, can hardly be summed up better than they were by Mr. Justice MILLER in a passage already quoted, where he said that the rule 'stands upon the broad ground that the contract itself is void, and that nothing which has been done under it, nor the action of the court, can infuse any vitality into it'; and that, 'where the parties have so far acted under such a contract that they cannot be restored to their original condition, the court inquires if relief can be given independently of the contract, or whether it will refuse to interfere as the matter stands.' *Pennsylvania R. Co.* v. *St. Louis etc. R. Co.,* 118 U. S. 317, 6 Sup. Ct. Rep. 1106, 1107 [30 L. Ed. 94]." (Italics ours.)

The precise question involved herein, in regard to the liability of a national bank on an alleged guaranty, is discussed in the cases of *Western Nat. Bank* v. *Armstrong,* 152 U. S. 346, 38 L. Ed. 470, 14 Sup. Ct. Rep. 572, and *Aldrich* v. *Chemical Nat. Bank,* 176 U. S. 618, 44 L. Ed. 611, 20 Sup. Ct. Rep. 498, 505, and the sole reason for allowing a recovery in such cases is well summed up in the following language from the latter case:

"There is nothing in the acts of Congress authorizing or permitting a national bank to appropriate and use the money or property of others for its benefit without liability for so doing. . . . So, if the Fidelity Bank took the benefit of that credit with knowledge of all the facts, then its defense is without excuse and immoral. If it innocently availed itself of that credit without knowledge of the facts, the principles of natural justice demand that it be held accountable for the money of another bank which it used in its business without giving any consideration therefor."

It will thus be seen that the decisions supporting the right of recovery of money paid as the result of an *ultra vires* agreement are based on the injustice of allowing A to retain money which B has in good faith and without consideration paid to him, relying upon a promise of repayment. We think, however, that, if there was a legal or moral obligation resting upon B to pay the money to A, the situation is very different, and such, in effect, is the plea of defendant. It alleges, in substance, that as a matter of law plaintiff, under sections 5200 and 5239, Revised Statutes of the United States (12 U. S. C. A., §§ 84, 93), was liable to it for the full amount of the McElrath note, as being an excess loan made in violation of law, and therefore plaintiff may not recover as for money had and received, as was permitted in the case of *Aldrich* v. *Chemical Nat. Bank, supra.* We are of the opinion that the position of defendant on this point, if

sustained by the facts, is well taken. The whole transaction, reduced to its lowest terms, undoubtedly is as follows: By reason of McElrath's failure to pay his note of some $32,000 when it became due, plaintiff was compelled to pay the sum which he now seeks to recover from defendant. If, as a matter of fact, plaintiff was legally or morally bound in the first place to pay to defendant the amount of the McElrath note, equity and justice do not require that he now recover that amount, or any part thereof.

We must then determine whether as a matter of law or morals he was under such obligation. The statute fixing the liability of directors for excess loans reads as follows:

"Section 5239: . . . And in cases of such violation, every director who participated in or assented to the same shall be held liable in his personal and individual capacity for all damages which the association, its shareholders, or any other person, shall have sustained in consequence of such violation." (12 U. S. C. A., § 93.)

The Supreme Court of the United States, in the case of *Corsicana Nat. Bank* v. *Johnson*, 251 U. S. 68, 64 L. Ed. 141, 40 Sup. Ct. Rep. 82, 84, has interpreted the statute as follows:

"Under the rule settled by familiar decisions of this court, in order for the bank to prevail in this action it must appear not only that the liabilities of a person, company, firm, etc., to the bank for money borrowed were permitted to exceed the prescribed limit, but that defendant, while a director, participated in or assented to the excessive loan or loans, not through mere negligence, but knowingly and in effect intentionally (*Yates* v. *Jones Nat. Bank*, 206 U. S. 158, 180, 51 L. Ed. 1002, 27 Sup. Ct. Rep. 638), with this qualification, that if he deliberately refrained from investigating that which it was his duty to investigate, any resulting violation of the statute must be regarded as 'in effect intentional' (*Thomas* v. *Taylor*, 224 U. S.

73, 82, 56 L. Ed. 673, 678, 32 Sup. Ct. Rep. 403; *Jones Nat. Bank* v. *Yates,* 240 U. S. 541, 555, 60 L. Ed. 788, 799, 36 Sup. Ct. Rep. 429).''

It appears from that case that a director, in order to be held liable for an excess loan, must have assented to it knowingly and intentionally, or else. *must have deliberately refrained from investigating that which it was his duty to investigate.* Do plaintiff's actions in regard to the McElrath note fall within this category? Taking the evidence in regard to his connection with the transaction in the strictest manner in his own favor, as we must in this case, it appears he was, and had been for ten or fifteen years, a director in defendant bank and its predecessor, and had been present at a large percentage of its meetings, although not at all of them.

In 1919, McElrath was indebted to defendant in the sum of forty-seven thousand dollars, over three times as much as the law permitted, and the bank examiner had notified defendant the excess loan must be reduced, and the law regarding such loans strictly observed in the future. On January 30th of that year a letter was addressed to the Comptroller of the Currency, acknowledging the situation and specifically mentioning the McElrath indebtedness, and promising that the bank examiner's instructions would be followed in the future. Plaintiff signed this letter. After this, defendant loaned McElrath at least twenty thousand dollars more, while his total indebtedness still exceeded the legal limit, plaintiff being present at the directors' meetings when such loans were approved. On March 21st, 1921, McElrath's total indebtedness was finally consolidated in the thirty-two thousand dollar note involved in the present action.

Plaintiff's testimony in regard to his knowledge of the entire transaction, and, in fact, of everything that

was done by defendant bank, and by its board of directors as such, while he was a director, is contained substantially in the following summary:

"I was a director, but didn't know anything about the bank. I was merely there as a figurehead, a rubber stamp. When they told me to sign, I signed, and that is all there was about it. I wasn't there at the annual meetings, and had nothing to do with lending out loans. I considered my duties as a director to be helping the bank by reason of being an honest man."

This can only mean that plaintiff became a director in defendant bank with the intention of capitalizing for its benefit his reputation in the community as an honest man, so that his friends and neighbors, knowing he was a director, would entrust their business to defendant, while at the same time he had no intention of watching or participating in its conduct, so as to insure that its depositors, who had relied on his connection with the bank to protect them, would be properly safeguarded. It may be that plaintiff conceived this conduct to be a fulfillment of the duty placed on him by the law, but we are of the opinion it falls far short of such. In the case of *Gibbons* v. *Anderson*, (C. C.) 80 Fed. 345, 349, the court well states the duty of directors in a national bank:

"In my opinion, it does not meet the requirements of this statement of the law that directors may confide the management of the operations of the bank to a trusted officer, and then repose upon their confidence in his right conduct, without making examinations themselves, or relying upon his answers to general questions put to him with regard to the status of the affairs of the bank. To begin with, it is to be assumed in every case that the directors have not selected any other than a man of good reputation for capacity and integrity. Any other idea assumes that they have been guilty at the outset of a glaring fault. Further, it is a well-known fact that a large proportion of the disasters which befall banking insti-

tutions come from the malfeasance of just such men, and it would be manifest to everybody that only a satisfactory and quieting reply would be made by the official who has any reason for concealment. Again, what are the duties of management that are committed to the cashier, or the officer standing in his place? They are those which relate to the details of the business, to the conduct of particular transactions. Even in respect of those, his duties are conjoint with those of the board of directors. In large affairs it is his duty to confer with the board. In questions of doubt and difficulty, and where there is time for consultation, it is his duty to seek their advice and direction. It is his duty to look after the details of the office business, and generally to conduct its ordinary operations. It is the right and duty of the board to maintain a supervision of the affairs of the bank; to have a general knowledge of the manner in which its business is conducted, and of the character of that business; and to have at least such a degree of intimacy with its affairs as to know to whom, and upon what security, its large lines of credit are given; and generally to know of, and give direction with regard to, the important and general affairs of the bank, of which the cashier executes the details. They are not expected to watch the routine of every day's business, or observe the particular state of the accounts, unless there is special reason; nor are they to be held responsible for any sudden and unforeseen dereliction of executive officers, or other accidents which there was no reason to apprehend.

"The duties of the board and of the cashier are correlative. On one side are those of an executive nature, which relate mainly to the details. On the other are those of an administrative character, which relate to direction and supervision; and supervision is as necessarily incumbent upon the board as direction, unless the affairs of banks are to be left entirely to the trustworthiness of cashiers. Doubtless there are many matters which stand on middle ground, and where it may be difficult to fix the responsibility, but I think there is no such difficulty here. The idea which seems to prevail in some quar-

ters, that a director is chosen because he is a man of good standing and character, and on that account will give reputation to the bank, and that his only office is to delegate to some other person the management of its affairs, and rest on that until his suspicion is aroused, which generally does not happen until the mischief is done, cannot be accepted as sound. It is sometimes suggested, in effect, that, if larger responsibilities are devolved upon directors, few men would be willing to risk their character and means by taking such an office; but Congress had some substantial purpose when, in addition to the provision for executive officers, it further provided for a board of directors to manage the bank and administer its affairs. The stockholders might elect a cashier, and a president as well. The banks themselves are prone to state, and hold out to the public, who compose their boards of directors. The idea is not to be tolerated that they serve as merely gilded ornaments of the institution, to enhance its attractiveness, or that their reputations should be used as a lure to customers. What the public suppose, and have the right to suppose, is that those men have been selected by reason of their high character for integrity, their sound judgment, and their capacity for conducting the affairs of the bank safely and securely. The public act on this presumption, and trust their property with the bank in the confidence that the directors will discharge a substantial duty. How long would any national bank have the confidence of depositors or other creditors if it were given out that these directors whose names so often stand at the head of its business cards and advertisements, and who are always used as makeweights in its solicitations for business, would only select a cashier, and surrender the management to him? It is safe to say such an institution would be shunned and could not endure. . It is inconsistent with the purpose and policy of the banking act that its vital interests should be committed to one man, without oversight and control.''

We are of the opinion that plaintiff, by his own testimony, has shown a deliberate refraining from

investigating what it was his duty to investigate in regard to the McElrath excess loan to such an extent that his participation therein must be regarded as a matter of law "in effect intentional." Such being the case, under the doctrine laid down in *Corsicana Nat. Bank* v. *Johnson, supra,* plaintiff was individually liable to the defendant bank on March 1st, 1921, for the entire sum loaned, plus interest, and less salvage, since the various loans had on that date in effect been consolidated in one single transaction. Since he was liable for the full amount of the McElrath note, he cannot now claim that he may recover from defendant the amount which he paid thereon.

It is urged, however, by plaintiff that the statute of limitations has run against his liability on that note, even admitting that such liability ever did, as a matter of law, exist. We think we need not consider this question, for the reason that, even assuming, without admitting, the plea of the statute would be good as against an action by defendant to recover any portion of the McElrath note from plaintiff, or as against a counterclaim or set-off of such note, it does not apply when the transaction is plead only as a defense. 17 R. C. L. 745; 37 C. J. 803, 804, and cases cited. In the case at bar, plaintiff must rely, in order to recover on his plea of a specific guaranty, on the intrinsic injustice and lack of equity of allowing defendant to retain plaintiff's money, obtained as a result of the guaranty, and an allegation of facts which show plaintiff's obligation on the McElrath transaction is strictly defensive matter, as showing there is no such injustice or lack of equity under the circumstances. As plaintiff only did what he was at one time, at least legally and at all times morally bound to do, when he paid the McElrath note, we are of the opinion this case does not fall within either the

letter or the spirit of the Aldrich and Pullman cases, *supra*.

If the situation is as set forth in (c), the liability of defendant would depend upon whether plaintiff was an accommodation maker under the statute or not. Let us consider the law on this question, as applied to the facts. An accommodation party is one who has signed an instrument as maker or indorser without receiving value therefor, and for the purpose of lending his credit to some other person. Paragraph 4174, Rev. Stats. Ariz. 1913 (Civ. Code); *Vitkovitch* v. *Kleinecke*, 33 Tex. Civ. App. 20, 75 S. W. 544; 8 C. J. 252. If there is a sufficient consideration accruing to the maker of the note for the signing, he is not an accommodation party in the legal meaning of the word, even though he signed for the accommodation of another. *Thompson* v. *Whitney*, 17 Hawaii 107; *First Nat. Bank of Vienna* v. *Engebretson*, 28 S. D. 185, 132 N. W. 786; 8 C. J. 255.

It is urged by defendant that plaintiff in this case was not an accommodation party, in that he received value for executing the note. The undisputed evidence shows that, at the time it was made, plaintiff was a director and stockholder in defendant bank, and in addition was indebted to it in a considerable sum due on demand. A somewhat similar situation has arisen in a number of adjudicated cases. In that of *Interstate Trust & Banking Co.* v. *Irwin*, 138 La. 325, Ann. Cas. 1917C 935, 70 South. 313, 317, the state bank examiner deemed the capital stock of a certain bank impaired, and notified the officers that, unless it was made good, he would close the bank. The directors of the bank individually borrowed a large sum of money and placed it to the credit of the bank, they having been advised that they would not have to pay it, but that the stockholders of the bank, if it prospered, would doubtless pay it from the earn-

ings. The bank finally went into liquidation, and the directors who had signed the note endeavored to compel the liquidating commissioners to apply the funds of the bank to its payment, instead of distributing them among the stockholders as dividends. It will be seen that in all essential particulars the legal issues involved were similar to those of the case at bar. The court held as follows:

"(1) The act of the defendant and other directors, discounting their promissory note and placing the proceeds to the credit of the People's Bank & Trust Company, was a donation to the bank. It is one of the methods by which the directors are permitted to make good an impairment of the capital stock of a bank, under the provisions of section 17 of Act No. 179 of 1902. See *Kennedy* v. *Young, State Bank Examiner*, 136 La. 674, 67 South. 547, L. R. A. 1915D 935. In such case, the contribution must be regarded as a gift by the individual directors to the bank, because, if the bank incurred an obligation to return the amount that was contributed to make good the impairment of its capital stock, there would be no improvement in the condition of the bank. See *Wright et al.* v. *Gurley*, 133 La. 746, 63 South. 310.

"(2) The defendant and other directors of the People's Bank & Trust Company had a substantial interest in trying to save the bank from failure. This and their natural obligation to make good the impairment of its capital stock was deemed by them a sufficient consideration for signing and issuing the note. It has been decided, with regard to this note, in *Wright et al.* v. *Gurley* (cited above), that, although the natural obligation of the directors to make good the impairment of the capital stock of their bank could not have been enforced judicially, it was a sufficient consideration for the note they gave, and that a suit would not prevail to recover what was given in compliance with that natural obligation. R. C. C. 1759."

See, also, *Reed* v. *First Nat. Bank of Pueblo*, 23 Colo. 380, 48 Pac. 507; *Dykman* v. *Keeney*, 16 App.

Div. 131, 45 N. Y. Supp. 137, affirmed 160 N. Y. 677, 54 N. E. 1090; *Deibel* v. *Jefferson Bank,* 200 Mo. App. 541, 207 S. W. 869.

In addition, as we have shown, plaintiff, at the time he signed the note to the bank, was legally bound to protect it on the McElrath note, unless the statute of limitations had run. But, even admitting the statute applied, the original liability is sufficent consideration for the later promise. 6 R. C. L. 669. We are of the opinion that, on the undisputed facts in this case, plaintiff was not an accommodation maker within the definition of the statute, and that he cannot recover on the theory that he is such.

Since, under the law and any theory of the evidence, plaintiff is not entitled to recover on either count of his complaint, the court properly instructed a verdict for defendant.

Judgment affirmed.

McALISTER and ROSS, JJ., concur.